RUSSELL PERKINSON, d/b/a Porkville, Petitioner, v. THE POLLUTION CONTROL BOARD *et al.*, Respondents.

Third District   No. 3—88—0758

Opinion filed August 24, 1989.

Erwin, Martinkus, Cole & Ansel, Ltd., of Champaign (Marc J. Ansel, of counsel), for petitioner.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Patricia E. Collins, Michelle D. Jordan, and Matthew J. Dunn, Assistant Attorneys General, of Chicago, of counsel), for respondent Pollution Control Board.

Thomas Davis, of Illinois Environmental Protection Agency, of Springfield, for respondent Illinois Environmental Protection Agency.

JUSTICE BARRY delivered the opinion of the court:

Russell Perkinson, the owner and operator of a swine farm, appeals from an opinion and order of the Illinois Pollution Control Board which found that he had caused or allowed an illegal discharge of swine waste into a stream. He was ordered to pay a fine of $10,000 and the cost of the resulting fish kill, an additional $10,376.

According to a stipulation of facts filed by the parties, on July 7, 1983, an estimated 400,000 gallons of liquid swine waste escaped from one of two lagoons where the waste was accumulated from Perkinson's swine buildings and entered an unnamed tributary to Spring Creek near Thawville in Iroquois County, Illinois. As a result of the pollution, 101,219 fish were killed having a value of $10,376.

The parties further stipulated that the discharge was caused by a man-made trench or channel cut directly through the east dike of the north lagoon near its north end and that Perkinson did not cause or authorize the trench and has no knowledge of who was responsible for it. Additionally, it was stipulated that Perkinson learned of the discharge at about 2 p.m. on July 7, 1983, but he did not notify any authorities and did not send a report to the Environmental Protection Agency. On July 8 after the EPA was notified of the fish kill by an unnamed informant, the incident was investigated by Eric Ackermann.

The stipulation set forth Perkinson's past compliance history and also described a second discharge incident which occurred on July 16, 1984, when a temporary obstruction in the drainage alley between buildings caused swine waste to flow into an adjacent field. In both instances of discharge, the waste entered field drain tiles which were connected to a discharge pipe into the water of the stream.

At the hearing before a hearing officer of the Pollution Control Board, a Perkinson employee, Ken Hanford, testified that he discovered the trench which had caused the liquid waste in the lagoon to drain into the adjacent field. He notified first Dave and then Russell Perkinson. The latter went out to view the trench and promptly filled it in by shoveling back into the trench the dirt piled beside it. The trench was described as being 18 inches wide, 16 inches deep, and 8 feet long.

The lagoons which held the swine waste were constructed with berms of compacted soil. Russell Perkinson stated that there had been some problems with seepage through the north berm due to the permeability of the soil used to construct that berm. A neighbor's field ad-

joining the lagoon area had incurred some crop damage due to excessive seepage. Perkinson had constructed a ditch parallel to the berm so the liquid could be pumped back into the lagoon. He stated that in August of 1983 he replaced the loose permeable soil with clay to form a watertight, impermeable berm.

The witnesses testified that they did not know who would have dug the trench and that they did not do so and did not authorize any other employees to do so. The swine farm operation employed seven persons, but, other than Hanford, those employees were primarily involved with indoor work in the hog confinement buildings. Russell Perkinson stated that he did not suspect any of his neighbors or either of two former employees and that he did not report the vandalism to law enforcement authorities.

Eric Ackermann, an EPA investigator, testified that he came to Perkinson's farm on July 8 to investigate the pollution of Spring Creek and its tributary. He observed a large wet area in Perkinson's corn field and saw debris and erosion on the back side of the east dike. One of the documents stipulated to by the parties was Ackermann's report of that investigation in which he determined that there had been seepage of wastewater through the dikes of the north lagoon, that the recent discharge through the trench occurred during dry weather and not during a catastrophic rainfall event, and that Perkinson failed to notify the EPA of the discharge.

The Pollution Control Board (PCB or Board) found that Russell Perkinson was in violation of sections 12(a) through 12(f) of the Illinois Environmental Protection Act (Ill. Rev. Stat. 1985, ch. 111½, pars. 1012(a) through (f)), several rules and regulations of the Pollution Control Board, and two of the conditions in Perkinson's NPDES (National Pollutant Discharge Elimination System) permit requiring notification of any discharge. The Attorney General requested a fine of $10,000 for each of the nine counts in addition to the value of the fish killed. The Board noted that nine counts of the complaint involved only two instances of violations and that the penalties recommended could be an "unmanageable burden" on Perkinson. The Board then assessed a fine of $10,000 for the 1983 violation and $1,000 for the 1984 violation in addition to the payments required for the two fish kills: $10,376.84 for 1983 and $443.26 for 1984.

On appeal, Perkinson does not dispute the 1984 violation, but he does contend that he was not guilty of "causing or allowing" an unlawful discharge on July 7, 1983, and even if he were guilty, the imposition of a fine of $10,000 in addition to the value of the fish kill was an abuse of the discretion of the Pollution Control Board.

■ Perkinson argues that the only possible conclusion based on the evidence is that the trench was dug by a trespassing vandal and, consequently, that it was error to find that he caused or allowed the discharge to occur. He correctly notes that the law does not impose strict liability on property owners for pollution which results from a cause beyond the owner's control. *Phillips Petroleum Co. v. Pollution Control Board* (1979), 72 Ill. App. 3d 217, 390 N.E.2d 620.

Two cases involving railroad tank cars are cited by Perkinson in support of his contention that he neither caused nor allowed the swine waste discharge here. In *Phillips Petroleum Co. v. Pollution Control Board,* a tank car of anhydrous ammonia owned by Phillips was under the sole control of the transporting railroad when it was punctured in a derailment and released poisonous gas into the air. Since there was no evidence showing that Phillips, the alleged polluter, had the capability of controlling the pollution or was even in control of the premises where the pollution occurred, the appellate court affirmed a finding that Phillips did not cause or allow the pollution.

The second tank car case is *Union Petroleum Corp. v. United States* (Ct. Cl. 1981), 651 F.2d 734, where the valves on two cars were opened by vandals during a labor strike. The cars were at a loading rack at Union's terminal in Massachusetts, and the spilled oil eventually reached Chelsea Creek. As soon as the oil spill was discovered, Union took appropriate measures to contain the spill and to clean up the oil. The litigation arose when Union sought to recover the cost of clean up from the United States government. The Court of Claims noted that, under the Federal statute, a claimant cannot recover where a vandal or third party caused the spillage if the claimant does not prove that reasonable actions were taken to prevent or forestall such intervention by a third party. The trial judge ruled in favor of Union, concluding that the discharge was caused by unknown vandals in spite of the company's reasonable precautions against vandalism, and the Court of Claims affirmed. Union had fenced in the most accessible part of its terminal, had installed 1,000-watt mercury streetlights in the vicinity of the tank cars, and had employed additional security guards to patrol the area during the strike. There was also persuasive evidence that Union had adequate oil-containment facilities and took reasonable care to prevent the spill.

■ The evidence in the case at bar is far less favorable to the owner of the premises where the pollution occurred. There is nothing to indicate that Perkinson had taken any precautions against vandalism, and other than his disavowal of any knowledge or authorization for the digging of the trench, no evidence of the source of the trench

was introduced at all. At most Perkinson's evidence would permit the trier of fact to draw an inference of third-party intervention, but that evidence does not compel a finding that Perkinson took reasonable precautions to prevent such occurrences.

■ Many cases have held that the owner's lack of knowledge of the discharge is no defense under the Environmental Protection Act. The leading case is *Meadowlark Farms, Inc. v. Pollution Control Board* (1974), 17 Ill. App. 3d 851, 308 N.E.2d 829, where water pollution was caused by seepage through mine refuse piles. The PCB found that Meadowlark Farms owned the surface rights of the property and thus owned the source of the pollution and had the capability of controlling the pollutional discharge. The reviewing court affirmed and stated:

> "Petitioner's so-called lack of knowledge that the discharge existed provides no defense. The Environmental Protection Act is *malum prohibitum*, no proof of guilty knowledge or *mens rea* is necessary to a finding of guilt." 17 Ill. App. 3d at 861, 308 N.E.2d at 837.

A similar holding is found in *Freeman Coal Mining Corp. v. Pollution Control Board* (1974), 21 Ill. App. 3d 157, 313 N.E.2d 616, another case where water pollution occurred when rainwater seeped through a mine refuse pile. Again, the court ruled that the fact that pollution came from the seepage off the owner's land was sufficient proof that the owner allowed the discharge within the meaning of the statute. It was no defense that the discharges were accidental and not intentional or that they were the result of an "Act of God" (rain) beyond its control. The court relied in part upon a case from another jurisdiction which held that the legislature had imposed a duty to take all prudent measures to prevent pollution.

In *Hindman v. Pollution Control Board* (1976) 42 Ill. App. 3d 766, 356 N.E.2d 669, the operator of a landfill site was held accountable for a fire that was not started by either the operator or his employees. The court relied upon the *Meadowlark Farms* case and upon *Bath, Inc. v. Pollution Control Board* (1973), 10 Ill. App. 3d 507, 294 N.E.2d 778, and ruled that a violation is not predicated upon proof of guilty knowledge or intentional harm. In the *Bath* case, the owner of a landfill was held to be responsible for underground burning even though the cause was unknown and not the result of the owner's affirmative act.

■ The case before us is controlled by the long line of precedent in Illinois which holds that the owner of the source of the pollution causes or allows the pollution within the meaning of the statute and is

responsible for that pollution unless the facts establish the owner either lacked the capability to control the source, as in *Phillips Petroleum*, or had undertaken extensive precautions to prevent vandalism or other intervening causes, as in *Union Petroleum*. Here Perkinson plainly had control of the lagoons and the land where the pollutional discharge occurred. The PCB concluded that he is liable for the pollution that had its source on his land and in a waste facility under his control. Under well-established Illinois law, that is sufficient to support a finding of a violation of the Environmental Protection Act.

We note that the PCB also found violations consisting of several months of seepage of swine waste through the lagoon wall on the north and of Perkinson's failure to report the major event as required. Perkinson does not contest those findings which also support the order appealed from.

■ Perkinson also insists that the $10,000 penalty was too severe, particularly since he has a good history of attempting to comply with all the requirements of the Environmental Protection Agency. It would unnecessarily prolong this opinion to recite Perkinson's many dealings with the Agency. Suffice it to say that he had some unauthorized discharges from his operation in 1979 and that he did what the Agency recommended to prevent further discharges. Perkinson also testified that he took further steps after the 1983 incident to end the seepage problem by making the north lagoon more watertight.

Plainly the $10,000 fine was well within the statutory authority of the Pollution Control Board, and it was substantially less than the $10,000 on each of nine counts requested by the Environmental Protection Agency. Perkinson argues that the Board failed to give sufficient weight to the mitigating factors, particularly to the fact that he had no knowledge of or responsibility for the vandalism. On the other hand, the Board had to consider the continuing seepage problem that preceded this major pollution event and the fact that Perkinson failed to give immediate notice as required by his permit. As a court of review, we will not substitute our judgment for that of the Pollution Control Board absent a clear abuse of discretion. We view the fine as reasonable under the facts of this case.

The order of the Pollution Control Board is affirmed.

Affirmed.

HEIPLE and SCOTT, JJ., concur.