THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v.
A.J. DAVINROY CONTRACTORS, Defendant-Appellee.

Fifth District   No. 5—91—0770

Opinion filed August 12, 1993.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Susan Frederick Rhodes, Assistant Attorney General, of Chicago, of counsel), for the People.

Robert H. Rice, of Rice Law Offices, of Belleville, for appellee.

JUSTICE LEWIS delivered the opinion of the court:

The State of Illinois, through the Illinois Attorney General's office, appeals from the denial of its complaint against defendant, A.J. Davinroy Contractors (Davinroy), wherein the State sought an injunction and monetary penalties against defendant for alleged violations of the Illinois Environmental Protection Act (the Act) (Ill. Rev. Stat. 1991, ch. 111½, par. 1001 *et seq.*). The complaint alleged that defendant had allowed large quantities of raw sewage to be discharged into Gooselake Ditch (the ditch), in violation of sections 12(a) and (f) of the Act. (Ill. Rev. Stat. 1991, ch. 111½, pars. 1012(a), (f).) The court, after a bench trial, entered an order denying all relief requested by the State, finding that the problem about which the State complained had been in existence for many years before defendant's involvement, that defendant had no practical alternative other than to discharge the sewage into the ditch, and that an injunction would be moot because the defendant had already completed all work at the site. The State appeals, claiming that the trial court's decision was against the manifest weight of the evidence under both sections 12(a) and (f). (Ill. Rev. Stat. 1991, ch. 111½, pars. 1012(a), (f).) For reasons more fully stated below, we reverse the trial court's order.

Prior to the hearing, the court entered partial consent orders between the Illinois Environmental Protection Agency (agency) and the Village of Cahokia (village) and an engineering firm working for the village, Hurst-Rosche Engineers, Inc. (engineers). In exchange for the village's agreement to cooperate in the prosecution of the case against Davinroy and payment of a $10,000 fine, the agency agreed to dismiss its case against the village for an alleged violation resulting out of the same construction project on which Davinroy was working. Similarly, the engineers were also dismissed out of the case in return for their agreement to pay a $3,500 penalty and to help prosecute the case against Davinroy.

At the hearing, Joseph Mahlandt, an engineer from the agency, testified that Davinroy was the contractor hired by the village in 1984 to repair or install several lift stations for the village's sewer system. Davinroy did not have a permit authorizing the discharge of contaminants during that construction project. The parties stipulated to the admission of 12 exhibits which detailed Mahlandt's inspections of the construction site and his findings regarding discharge of sewage into the ditch. Basically, the main problem with Davinroy's work, according to Mahlandt, was that its equipment was not properly maintained so that periodically the pumps would malfunction or stop working al-

together and raw sewage would run into the ditch instead of through the sewer line to the treatment plant. The repair of the lift stations required Davinroy to bypass the normal sewer route at each construction site so that the work could be performed in a dry area. In order to bypass the normal system, pumps were used and the sewage was thereby rerouted to a main sewage line running some three miles from this construction site to the treatment plant. The contract between Davinroy and the village provided that Davinroy was to maintain the sewage flow through the lift stations as work was commenced at each station. The contract gave defendant the option of either using the existing bypass system which was already in place, since most of the lift stations were not operational by the time Davinroy began its work, or installing a system of its own. Davinroy chose to use the temporary system already in place.

Specifically, the exhibits stipulated to by the parties established that Mahlandt observed raw sewage being discharged into the ditch from construction sites under the control of Davinroy on seven separate occasions between July 25, 1984, and May 24, 1985. On at least one occasion, Davinroy admitted to a violation and was advised to pump the sewage around the work station and into the same downstream manhole that it had been using previously. Davinroy claimed that the sewage had always flowed into the ditch at this area of the sewer system, but Mahlandt assured Davinroy's owner during his initial inspection of July 25, 1984, that Davinroy's activities over the weekend of July 20 were definitely the cause of the condition of the ditch at that time, which was grayish in appearance with significant gasification. Each time Mahlandt inspected, he found that the ditch adjacent to Davinroy's work sites was a turbid gray color and had a septic, sewage odor. Further, many of the problems were initially reported to the agency from people who lived near the ditch, rather than by the engineers, village, or Davinroy.

In addition to the memorandums from Mahlandt specifying the results of his inspections of the ditch and the construction sites, the parties also stipulated to a letter from the engineers to Davinroy, dated August 11, 1984. The letter advised that raw sewage was bypassing the sewer system and flowing directly into the ditch. It stated that Davinroy had been advised of this problem on numerous occasions in the past. According to the letter, Davinroy had agreed to rectify the problem but had not. Therefore, the letter advised Davinroy that it was in violation of its contract in that Davinroy was responsible for the operation and maintenance of the existing pumping systems in each location where its crews were working. Further, the let-

ter advised Davinroy that its actions were violating agency regulations. Davinroy was directed to immediately begin to sterilize the ditch by using chlorine, which was to be done to the satisfaction of the agency. All costs were to be borne by Davinroy. Finally, the letter stated that Davinroy's continued failure to comply with the engineers' requests and the requirements of the contract between Davinroy and the village would be sufficient reason for the engineers to recommend that the village terminate the contract and deduct all expenses from payments remaining due to Davinroy.

On January 30, 1985, Mahlandt collected water samples from the ditch upstream and downstream from the construction site and also collected samples of the sewage being discharged into the ditch. The results of the tests, which were stipulated to by the parties, show that the levels of contaminants in the discharge itself as well as in the ditch just downstream from the construction site exceeded the levels allowable under agency regulations but that the contaminants were within acceptable levels upstream from the construction site.

The only other witness for the State was Dean McIlravey, the general manager of the engineers, Hurst-Rosche. He testified that at the time Davinroy started work on the lift stations, a temporary bypass system was in place, and Davinroy chose to use that system rather than bring in its own equipment. During the period when Davinroy was working on the lift stations, McIlravey did not believe that the main sewer line past the lift stations was damaged, but he could not specifically remember. Previously, Mahlandt had testified that he could not swear that the main sewer line was functioning properly during the time Davinroy was working on the lift stations. McIlravey stated that during the time when Davinroy was working on the sewer, he did not know of any sewage breaks occurring in the area where Davinroy was working other than those caused by Davinroy. Finally, McIlravey testified that it would cost about $1 million to run a bypass system from the area where Davinroy was working to the treatment plant.

The only witness for the defense was A.J. Davinroy, the owner of the company. He testified that his company had intentionally pumped raw sewage into the ditch because that practice had been followed for at least 10 years before his company began work on the sewer line. In his opinion, there was no other practical way to accomplish the job of repairing the lift stations. He further stated that he was told by the engineers that occasionally he would have to discharge sewage into the ditch and, in that event, he should contact the engineers, who would in turn contact the agency. He stated that in 1984, when his

crew was working on lift station number 5, the main sewer line had collapsed in an area down the line from station 5, but he admitted that he had not observed the main sewer line at the area of the alleged collapse in 1984 or 1985. He also admitted that it would not have cost him any additional money to periodically check the pumps to assure that they were operational.

■ The State appeals from the trial court's order denying all relief under the State's complaint. The statute upon which the State relies specifies the acts that are prohibited with reference to water pollution in the State of Illinois. The sections state as follows:

"No person shall:

(a) Cause or threaten or allow the discharge of any contaminants into the environment in any State so as to cause or tend to cause water pollution in Illinois, either alone or in combination with matter from other sources, or so as to violate regulations or standards adopted by the Pollution Control Board under this Act.

* * *

(f) Cause, threaten or allow the discharge of any contaminant into the waters of the State, as defined herein, including but not limited to, waters to any sewage works, or into any well or from any point source within the State, without an NPDES permit ***, or in violation of any regulations adopted by the Board or of any order adopted by the Board with respect to the NPDES program." Ill. Rev. Stat. 1991, ch. 111½, pars. 1012(a), (f).

■ In deciding whether the trial court's decision denying relief to the State is against the manifest weight of the evidence, we first look to the plain language of the statute. We find that the State proved a violation of the Act under the plain language of both section 12(a) and section 12(f). In summary, the State proved that Davinroy had discharged raw sewage, a contaminant, into Gooselake Ditch, that Davinroy had been warned many times by both the village and the engineers about the need to prevent those discharges, and that the sewage had caused unacceptable levels of pollution in the ditch past Davinroy's work sites that were not in existence in the ditch upstream of the work site. Davinroy does not refute any of these facts. We do not believe that the statute requires more than this.

In order for this court to find that the trial court's order is against the manifest weight of the evidence, it must appear that conclusions opposite those reached by the trial court, as the trier of fact, are clearly evident. (*Phillips Petroleum Co. v. Pollution Control*

*Board* (1979), 72 Ill. App. 3d 217, 390 N.E.2d 620.) The Act is *malum prohibitum*; for a violation to be found, it is not necessary to prove guilty knowledge or *mens rea*. Knowledge is not an element of a violation of section 12(a), and lack of knowledge is not a defense. (Ill. Rev. Stat. 1991, ch. 111½, par. 1012(a); *Meadowlark Farms, Inc. v. Pollution Control Board* (1974), 17 Ill. App. 3d 851, 308 N.E.2d 829.) Nevertheless, the fact that guilty knowledge is not a necessary element of proof under the Act does not mean that alleged polluters are under a theory of strict liability. The State must show that the alleged polluter has the capability of control over the pollution or that the alleged polluter was in control of the premises where the pollution occurred. *Phillips Petroleum Co. v. Pollution Control Board* (1979), 72 Ill. App. 3d 217, 390 N.E.2d 620.

"The analysis applied by courts in Illinois for determining whether an alleged polluter has violated the Act is whether the alleged polluter exercised sufficient control over the source of the pollution." (*People v. Fiorini* (1991), 143 Ill. 2d 318, 346, 574 N.E.2d 612, 623.) In the case at bar, the contract between the village and Davinroy sets forth Davinroy's responsibility for the sewer lines in the areas where its work was being done. The parties stipulated that the contract

"required Davinroy to comply with certain technical specifications which included the following:
*** 

Sewer flows equal to existing shall be maintained at all times during construction. The contractor shall install a temporary bypass system if required to maintain flows. The existing bypass systems or existing pump stations may be used at the contractor's option instead of installing new bypass pumping systems; *however, the contractor shall be responsible for the operation and maintenance of the existing pumping system at the particular location once excavation begins at that location.*" (Emphasis added.)

Two cases that concern the level of control required for a violation of section 12(a) are instructive. First, *Phillips Petroleum* scrutinizes a situation in which a railroad tank car was damaged in a train derailment, and ammonia was thereby released. Phillips Petroleum owned the tank car, but the appellate court held that there was no evidence that Phillips did anything to cause, threaten, or allow the pollution, because the train car was not under its control at the time of the accident but rather was under the complete control of the railroad company. *Phillips Petroleum Co. v. Pollution Control Board* (1979), 72 Ill. App. 3d 217, 390 N.E.2d 620.

The second case is *Perkinson v. Pollution Control Board* (1989), 187 Ill. App. 3d 689, 543 N.E.2d 901. In *Perkinson,* the court considered a situation in which the landowner had no knowledge of any violation of the Act from his hog-farming operation. The evidence in *Perkinson* showed that vandals caused the pollution without the landowner's knowledge or consent. However, since there was nothing in the record to establish that the landowner had taken any precautions to prevent the actions of the vandals, the landowner was held to be in violation and properly fined. (*Perkinson v. Pollution Control Board* (1989), 187 Ill. App. 3d 689, 543 N.E.2d 901.) The court in *Perkinson* reasoned that its decision was controlled by a long line of precedent in Illinois establishing that "the owner of the source of pollution causes or allows the pollution within the meaning of the statute [Ill. Rev. Stat. 1991, ch. 111½, par. 1012(a)] and is responsible for that pollution unless the facts establish the owner either lacked the capability to control the source, as in *Phillips Petroleum,* or had undertaken extensive precautions to prevent vandalism or other intervening causes." *Perkinson,* 187 Ill. App. 3d at 694-95, 543 N.E.2d at 904.

From our review of the record, the case *sub judice* appears to be much closer to the facts in *Perkinson* than the facts in *Phillips Petroleum.* The contract between Davinroy and the village conclusively establishes that Davinroy was "responsible for the operation and maintenance of the existing pumping system at the particular location once excavation" began. Davinroy does not deny that it discharged raw sewage on several occasions into the ditch. Davinroy was given a year and a half of warnings and did not comply. Davinroy argues that compliance and preventing the pollution would have been cost prohibitive. However, the evidence clearly shows that it was only during the times when the pumps broke down that the pollution events occurred. The pumps were under the control of Davinroy under the terms of the contract. Therefore, Davinroy's defense amounts to an assertion that something it was not required to do, run a bypass sewer line over three miles to the treatment plant, would have been cost prohibitive. The State did not argue or allege that Davinroy should have built a bypass line to the treatment plant. Mahlandt unequivocally testified that the problem with Davinroy's actions was that it did not properly maintain the bypass system it chose to use. We find that Davinroy neither lacked the capability to control the source of the pollution nor undertook any precautions to prevent the pollution. Therefore, the only conclusion we can reasonably reach from the record is that Davinroy should be held liable for a violation of section 12(a). Ill. Rev. Stat. 1991, ch. 111½, par. 1012(a).

The trial court found that there was evidence that the main sewer line had collapsed downstream from Davinroy's work site prior to Davinroy beginning work. However, we do not believe that the record establishes either that the sewer line had collapsed downstream of the work site or that any collapse occurred during or before Davinroy's involvement. Mahlandt testified that he could not swear that the sewer line was functioning during the year and a half of Davinroy's involvement, but the tests he took showing contamination in the ditch were done immediately adjacent to the work site and not downstream where Davinroy alleged the break occurred. Therefore, the pollution about which the State complained did not have anything to do with the area where the sewer line may have been collapsed. Further, McIlravey testified that he did not believe that the main sewer line was broken at the area in question during the period of Davinroy's work, and he did not recall any other pollution events during the time period, except those caused by Davinroy. Although Davinroy testified that the main sewer line was collapsed, he admitted that he had never seen any collapse but had only heard of it. We would be more sympathetic to Davinroy's argument and the trial court's finding if there had been some evidence that a collapsed main sewer caused pollution at the site where the line collapsed or that the collapsed line caused the sewage to back up to where Davinroy was working. In the absence of such evidence, we cannot relieve Davinroy of its responsibility not to pollute based on rumors and hearsay.

Moreover, the State did not charge Davinroy alone with this violation. Both the village and the engineers entered into consent orders with the agency and paid substantial fines for their involvement. Just because Davinroy's pollution may not have been the only cause of the violation is not sufficient to absolve it of liability. The statute clearly and plainly states that it is a violation of the Act to "[c]ause or *** allow the discharge of any contaminants *** so as to cause or tend to cause water pollution in Illinois, *either alone or in combination with matter from other sources.*" (Emphasis added.) (Ill. Rev. Stat. 1991, ch. 111½, par. 1012(a).) Thus, it is no defense that another party may have been partially responsible for the pollution, even if we take as true Davinroy's assertion that pollution had been discharged into the ditch for many years before its involvement. We cannot say that the evidence proves any conclusion other than that Davinroy was in control of the source of the pollution and that it caused or allowed the pollution to occur and is, therefore, in violation of section 12(a). Additionally, since Davinroy did not have a permit for discharging the con-

taminants into the ditch, it is also in violation of section 12(f). Ill. Rev. Stat. 1991, ch. 111½, pars. 1012(a), (f).

One final point we must consider is Davinroy's argument that the ruling in *Metropolitan Sanitary District v. Pollution Control Board* (1975), 62 Ill. 2d 38, 338 N.E.2d 392, controls. Its reliance is misplaced. In that case, the court considered the propriety of penalties imposed under section 31(c) by the Pollution Control Board. (Ill. Rev. Stat. 1971, ch. 111½, par. 1031(c).) The court found that the sanitary district had fallen victim to interagency conflicts which had caused delays in its ability to comply with the Act. The State was asking for penalties for past actions of the district, and the district was asking for a variance for future activities. The court found that under the statute controlling the case, penalties were not justified because they were purely punitive and not in furtherance of bringing the polluter into compliance with the law. The court held that the Act provides, via section 31(c), that the burden is on the agency to show that the alleged polluter caused or threatened air or water pollution, but that, if proved, the burden then shifts to the alleged polluter to show that compliance would impose an arbitrary or unreasonable hardship upon it. Ill. Rev. Stat. 1971, ch. 111½, par. 1031(c); *Metropolitan Sanitary District*, 62 Ill. 2d at 46, 338 N.E.2d at 394.

*Metropolitan Sanitary District* is not applicable to the facts of the case at bar. First, it deals with a statute that is not involved in the State's prosecution of this case. Second, the statute under which the State prosecutes in this case does not allow the alleged polluter to defend on the basis that compliance would be an unreasonable hardship. On the contrary, section 12(a) is violated even if the alleged polluter did not cause the pollution himself but only allowed it to happen through some other force's actions. (*Perkinson v. Pollution Control Board* (1989), 187 Ill. App. 3d 689, 543 N.E.2d 901.) Third, even if such a standard did apply to this case, Davinroy did not put on any evidence to show that compliance—specifically, keeping its pumps in working order and monitoring them for malfunction—was arbitrary or unreasonable.

The trial court apparently based its decision upon findings that the sewer line was broken past the work station, that Davinroy was not responsible for the sewer line past its work site, and that, as a result, no violation occurred. However, as we have already stated, the evidence supports the opposite conclusion: a violation occurred at Davinroy's work site because it caused or allowed raw sewage to be pumped directly into the ditch from the work site. The only discharges that Davinroy is charged with are ones that occurred when

the pumping system it was responsible for broke down. By logical extension, that means that no violation occurred when the pumps were working properly. Defendant's argument that there was no practical alternative to discharging raw sewage into the ditch misses the point. The alternative was in place and worked effectively except for the times when the pumps broke down. Each time the pumps malfunctioned, Davinroy eventually repaired them so that the violations ceased, but when the pumps did not work, raw sewage was being pumped into the ditch in violation of the Act.

One final note concerns the trial court's finding that an injunction would be unnecessary and pointless at this time since Davinroy has finished all work at the site. We agree, and therefore, upon remand, the trial court should consider only the request for penalties to be imposed and should not allow the State's request for an injunction against Davinroy.

For the reasons stated, we reverse and remand.

Reversed and remanded.

CHAPMAN, P.J., and GOLDENHERSH, J., concur.