# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

***Gonzalez v. Pollution Control Board*, 2011 IL App (1st) 093021**

---

| | |
|---|---|
| Appellate Court Caption | JOSE GONZALEZ and 1601-1759 EAST 130th STREET, L.L.C., Petitioners-Appellants, v. THE POLLUTION CONTROL BOARD, Respondent-Appellee. |
| District & No. | First District, Sixth Division<br>Docket No. 1-09-3021 |
| Rule 23 Order filed<br>Rule 23 Order withdrawn<br>Opinion filed | September 30, 2011<br><br>November 9, 2011<br>November 23, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The judgment of the Illinois Pollution Control Board finding petitioners in violation of sections 21(p)(2), (p)(3) and (p)(7)(i) of the Environmental Protection Act was affirmed. |
| Decision Under Review | Petition for Review of the Orders of the Illinois Pollution Control Board, Nos. AC-06-39, AC-06-40, AC-06-41, AC-07-25. |
| Judgment | Confirmed. |

Counsel on Appeal

Jeffrey J. Levine, P.C., of Chicago, for petitioners.

Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and John P. Schmidt, Assistant Attorney General, of counsel), for respondent Pollution Control Board.

Mara S. Georges, Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper, and J. Mark Powell, Assistant Corporation Counsel, of counsel), for respondent City of Chicago.

Panel

JUSTICE CAHILL delivered the judgment of the court, with opinion.

Presiding Justice R. Gordon and Justice Garcia concurred in the judgment and opinion.

## OPINION

¶ 1      Petitioners, Jose Gonzalez and 1601-1759 East 130th Street, L.L.C. (LLC), appeal the decision of the Illinois Pollution Control Board (Board) in favor of the City of Chicago department of environment (City). The Board found petitioners liable for causing or allowing the open dumping of waste in a manner resulting in litter, scavenging, open burning and the depositing of general construction or demolition debris in violation of sections 21(p)(1), (p)(2), (p)(3) and (p)(7)(i) of the Environmental Protection Act (Act) (415 ILCS 5/21(p)(1) through (p)(3), (p)(7)(i) (West 2006)). On appeal, petitioners contend that: (1) the evidence presented was inadequate to sustain the Board's findings that they violated the Act; (2) Gonzalez cannot be held liable for violations of the Act as a corporate agent; and (3) petitioners were denied due process of law at the administrative hearing. We affirm.

¶ 2      Based on a March 22, 2006, site inspection, the City issued three administrative citations (Nos. AC 06-39, AC 06-40, AC 06-41) to Speedy Gonzalez Landscaping, Inc. (SGLI), Gonzalez and the LLC, alleging they violated sections 21(p)(1), (p)(2), (p)(3), (p)(4), and (p)(7)(i) of the Act (415 ILCS 5/21(p)(1) through (p)(4), (p)(7)(i) (West 2006)).

¶ 3      On May 9, 2007, the Board set separate hearings for Nos. AC 06-39 and AC 06-40. At the No. AC 06-39 hearing, Rafael Maciel testified that he was a senior environmental engineer for the City. On March 22, 2006, Maciel and other City personnel were driving on 130th Street when they saw smoke and "flame" coming from the 1601 East 130th Street site (site). The site was fenced and the entrance gate was open. Maciel drove onto the site and saw landscaping materials, compost material, railroad ties, scrap metal, frayed wire and piles of construction and demolition debris.

¶ 4      Maciel also saw a water tanker with "Speedy Gonzalez Inc.," painted on the side, a dump truck bearing the name "E. King Hauling" and a front-end loader on the site. A second dump truck arrived later. The front-end loader was pushing material from the Chicago Transit

Authority's (CTA) "Brown Line" renovation project toward a large pile of debris. Maciel saw a pile of wood and other material being burned and two people sorting materials. The workers walked away when Maciel approached. Maciel directed the dump trucks not to leave during the investigation, but the second truck left the site. One of the workers gave Maciel a waste manifest and told Maciel the City had hired him for the job and that he had "to listen to my boss *** whatever my boss man says." A waste manifest is a log describing the type of material being transported, who generated it, who the transporter is and where it will be disposed.

¶ 5    A white pickup truck drove up to Maciel, and he recognized the driver as "Jose 'Speedy' Gonzalez" because the City had previously issued citations to SGLI. Maciel asked Gonzalez whether he was running an illegal "transfer station" and from where the waste manifest had come. Gonzalez said he did not know what Maciel was talking about and that Maciel was on private property and had to leave. Gonzalez then rolled up the window of his pickup truck and drove away.

¶ 6    Maciel and Chris Antonopoulos prepared an investigation report a day or two after investigating the property. Over Gonzalez's objection, the investigation report, site sketch, photographs, site ownership information and a lab report about soil samples were admitted into evidence. Over the City's objection, the waste manifest was also admitted into evidence.

¶ 7    On cross-examination, Maciel testified that although he got business cards from the drivers, he did not include them in the report because it is not customary to do so. The report did not include the waste manifest and the field notes about the drivers and license plates of the vehicles.

¶ 8    Maciel could not tell whether the front-end loader was loading or unloading waste. He initially said at his deposition the trucks were being loaded with waste; at the hearing he said that, based on the waste manifest and discussions with the on-site workers, he believed the trucks were dumping on the site.

¶ 9    Maciel testified that Chuck Webber, a consultant to the CTA, told him that the CTA, subcontractor Paschen Construction and Gonzalez had a verbal agreement to store the material from the CTA construction project in roll-off boxes on the site over the weekend. E. King was hired to haul the CTA materials and it was to be kept on the site over the weekend until the landfill reopened on Monday. Webber could not confirm that the materials on the site came from the CTA project.

¶ 10    Maciel said that he had some doubt as to whether Webber was telling the truth about the agreement with the CTA but admitted that his investigation confirmed the agreement existed. Maciel said he had received FBI training on assessing whether a person is telling the truth, although he did not mention the training at his deposition. Maciel did not recall the name of the course, the name of the teacher or the address of the course.

¶ 11    Maciel testified that he should have conducted a further investigation to determine whether other entities were involved in the violations. He had previously said to suspected violators, "[h]elp me help you out so you can avoid getting citations and you stay in compliance." He denied having said to Gonzalez, "[h]elp me help you avoid a citation" and said he had never taken a bribe. Maciel said that inspectors have some leeway to allow

property owners to come into compliance if a violation is not "drastic" and could be cured within a reasonable period. He was not interested in helping Gonzalez avoid a citation because this was a "big offense."

¶ 12    Maciel's testimony at the No. AC 06-40 hearing was generally consistent with his statements at the No. AC 06-39 hearing. Maciel said that a "lack of specificity" could be an indicator as to whether or not someone is telling the truth, although at the No. AC 06-39 hearing he had said that vague answers are not necessarily an indication that someone is not telling the truth.

¶ 13    Jose Gonzalez testified at the No. AC 06-39 hearing that he purchased the site in the winter of 2005-06. The site was 10 minutes away from Gonzalez's office and was "owned in the form of an LLC, by [him] privately." Gonzalez testified that he also owned SGLI but it had no connection to the site.

¶ 14    At the time of purchase, Gonzalez was aware of a considerable amount of debris on the property, including piles of used tires, rusted street signs and scrap metal. "Fly-dumping" was a constant problem on the property. Gonzalez explained that fly-dumping occurs when a trespasser takes waste materials onto another person's property and deposits them there without the owner's permission.

¶ 15    Gonzalez testified he planned to invest about $15 million to develop the site and lease space to the Ford Company. After the purchase, Gonzalez made improvements to the gate several times, but fly-dumpers continued to gain access to the property through the front gate by knocking it down, cutting the lock or pulling the gate off its hinges. Gonzalez did not begin cleaning the property until the snow started melting in 2006 because much of the waste was frozen. Some of the waste remained on the site on March 22, 2006.

¶ 16    Gonzalez testified he made an agreement with E. King Hauling to store the CTA waste in dumpsters or trucks until it could be taken to a nearby landfill. E. King was to pay Gonzalez $500 per night for using the site. Gonzalez gave E. King a key to the lock on the site's gate. On March 20, 2006, Gonzalez was informed that the gate was open. He went to the site and saw between 1,000 to 1,500 yards of debris from the CTA project deposited on the ground. He called the owner of E. King, who promised to clean up the debris that had been dumped on the property.

¶ 17    On March 22, 2006, Gonzalez saw Maciel when the front-end loader and trucks were loading and hauling material off the site. Workers on the site were picking out certain materials from the loads because otherwise the nearby landfill would not take them. Maciel told Gonzalez he was going to tow the trucks, but Gonzalez directed the workers to keep loading waste. Maciel told Gonzalez, "we are going to write you a ticket for everything that I could write you a ticket on," so that Gonzalez would "never [get] work from CTA ever again."

¶ 18    Gonzalez believed Maciel specifically targeted him. He testified that Maciel requested a bribe sometime before March 22, 2006, when Maciel approached him and said, "[w]e can work things out." Gonzalez told him to "just do [his] job" and leave, and Maciel responded, "[y]ou'll pay for this." Gonzalez also claimed that in previous cases, the City had given him time to correct the alleged violations, but he was not given that opportunity by Maciel.

¶ 19      Gonzalez's testimony at the No. AC 06-40 hearing was consistent with his testimony at the No. AC 06-39 hearing. At the No. AC 06-40 Gonzalez testified that he had spent approximately $30,000 to clean up the fly-dumped waste, funded by SGLI.

¶ 20      Inspector Chris Antonopoulos testified at the No. AC 06-40 hearing that he assisted Maciel in his investigation of the 1601 East 130th Street site on March 22, 2006. Antonopoulos photographed and documented the locations of the multiple waste piles on the site, containing scrap metal, PVC piping, tires, street signs, big chunks of concrete and general construction and demolition debris. Antonopoulos did not take photographs of the E. King trucks or the Paschen representatives.

¶ 21      Some of the waste piles indicated "classic fly-dumping." Antonopoulos found wire with the insulation partially removed, which was evidence of scavenging. He believed that the workers on the site were loading waste onto the trucks, including the E. King truck that left during the investigation, and cleaning the property. He did not know how the piles of material came to the site or whether the CTA material was actually from the CTA.

¶ 22      Antonopoulos believed that Maciel did a competent investigation on March 22, 2006, and Maciel's opinions about Gonzalez had no effect on the investigation. Antonopoulos said that an inspector's offer to "work things out" would mean the inspector would try to work with the person, not that he was soliciting a bribe. Antonopoulos also said that it was up to the inspector to determine whether owners should be given time to remove waste from their property, but it is not the City's policy or a common practice.

¶ 23      On May 17, 2007, the Board set a hearing for No. AC 06-41. The parties stipulated to the incorporation of Maciel's and Antonopoulos's testimony at the No. AC 06-40 hearing into the No. AC 06-41 hearing transcript. Gonzalez testified at the No. AC 06-41 hearing consistently with his statements at the Nos. AC 06-39 and AC 06-40 hearings.

¶ 24      On March 19, 2009, the Board issued its "Interim Opinion and Order." *City of Chicago Department of Environment v. Speedy Gonzalez Landscaping, Inc.*, Ill. Pollution Control Bd. Op. 06-39 (Mar. 19, 2009). The Board consolidated Nos. AC 06-39, AC 06-40, AC 06-41 and another citation proceeding, No. AC 07-25. No. AC 07-25 was issued to the LLC based on an October 3, 2006, site inspection. No. AC 07-25 was dismissed as improperly issued and is not at issue on appeal.

¶ 25      In its opinion, the Board first addressed a motion to dismiss filed by petitioners alleging City misconduct, including: solicitation of a bribe; false allegations; inadequate investigation; selective prosecution; selective responses in deposition testimony and failure to provide subpoenaed documents; and false testimony.

¶ 26      The Board denied petitioner's motion to dismiss, finding: (1) the evidence relating to Maciel's attempt to solicit a bribe was "inconclusive" and "unsubstantiated"; (2) petitioners failed to identify the allegedly false allegations; (3) the selective prosecution claim failed because it is within the City's discretion to decide to whom it issues administrative citations; (4) the alleged discovery omissions were harmless; and (5) the allegedly false testimony of Maciel was "merely in the nature of clarification and amplification" and petitioners suffered no material prejudice.

¶ 27      In addressing the merits, the Board first found that petitioners had allowed the open

dumping of the CTA and fly-dumped waste in violation of section 21(a) of the Act (415 ILCS 5/21(a) (West 2006)) because petitioners were in control of the site and failed to take reasonable precautions against the dumping of the waste.

¶ 28    Next, the Board found that petitioners: (1) violated section 21(p)(1) of the Act (415 ILCS 5/21(p)(1) (West 2006)) by allowing the open dumping of waste in a manner resulting in litter; (2) violated section 21(p)(2) of the Act (415 ILCS 5/21(p)(2) (West 2006)) by allowing the open dumping of waste in a manner resulting in scavenging; (3) violated section 21(p)(3) of the Act (415 ILCS 5/21(p)(3) (West 2006)) by allowing the open dumping of waste in a manner resulting in open burning; and (4) violated section 21(p)(7)(i) of the Act (415 ILCS 5/21(p)(7)(i) (West 2006)) by allowing the open dumping of waste in a manner resulting in the depositing of general construction or demolition debris.

¶ 29    The Board also found that: (1) the City failed to prove SGLI liable for a violation of the Act; (2) petitioners were not liable for fly-dumped waste deposited after they installed the locked gate; and (3) petitioners did not violate section 21(p)(4) of the Act (415 ILCS 5/21(p)(4) (West 2006)) because the open dumping did not result in the depositing of waste in standing water. The Board imposed civil penalties and hearing costs totaling $7,340.40 against Gonzalez and $7,189.40 against the LLC. Petitioners appeal.

¶ 30    The City contends in its brief that this appeal should be dismissed because petitioners have failed to comply with Supreme Court Rule 342(a) (Ill. S. Ct. R. 342(a) (eff. Jan. 1, 2005)) by omitting an appendix, petition of review and table of contents of the record. The City also contends that petitioners' statement of facts fails to comply with Supreme Court Rule 341(h)(6) (Ill. S. Ct. R. 341(h)(6) (eff. July 1, 2008)) by referring without citation to the record and by including an argumentative statement of facts. We decline to dismiss this appeal as we find the briefs and record sufficient to render a decision on the merits.

¶ 31    Petitioners first contend that the evidence presented was inadequate to sustain the Board's findings that they violated the Act. Specifically, petitioners contend that the City failed to show that they caused or allowed opening dumping on their property under section 21(a) of the Act (415 ILCS 5/21(a) (West 2006)).

¶ 32    Judicial review of administrative law decisions extends to "all questions of law and fact presented by the entire record." *Exelon Corp. v. Department of Revenue*, 234 Ill. 2d 266, 272, 917 N.E.2d 899 (2009). The Board's findings of fact will be upheld unless they are against the manifest weight of the evidence. *Peoria Disposal Co. v. Illinois Pollution Control Board*, 385 Ill. App. 3d 781, 793, 896 N.E.2d 460 (2008). A decision is against the manifest weight of the evidence only if "the opposite conclusion is clearly evident." *Roti v. LTD Commodities*, 355 Ill. App. 3d 1039, 1051, 823 N.E.2d 636 (2005).

¶ 33    To prove a violation under section 21(p) of the Act, the City must show a person "cause[s] or allow[s] the open dumping of any waste." 415 ILCS 5/21(a), (p) (West 2006). While knowledge is not an element of a violation of section 21(a) of the Act, the State "must show that the alleged polluter has the capability of control over the pollution or that the alleged polluter was in control of the premises where the pollution occurred." *People v. A.J. Davinroy Contractors*, 249 Ill. App. 3d 788, 793, 618 N.E.2d 1282 (1993). Property owners are responsible for the pollution on their land unless the facts establish the owners either

"lacked the capability to control the source" or "had undertaken extensive precautions to prevent vandalism or other intervening causes." *Perkinson v. Pollution Control Board*, 187 Ill. App. 3d 689, 695, 543 N.E.2d 901 (1989).

¶ 34    The Board's finding that Gonzalez and the LLC caused or allowed the open dumping of the preexisting fly-dumped waste and the CTA waste was not against the manifest weight of the evidence. The evidence shows that the LLC purchased the site in January 2005, and the site was "owned in the form of an LLC, by [Gonzalez] privately." Petitioners were aware of the preexisting fly-dumped waste at the time of the purchase but failed to remove it for over 14 months. Gonzalez built a fence around the property and an entrance gate. Petitioners made a voluntary agreement with E. King Hauling to store CTA waste in dumpsters or trucks for $500 per night and gave E. King a key to the lock on the site's gate. Gonzalez was present on the site and monitoring the cleanup during the March 22 investigation. The evidence shows that petitioners were in control "of the premises where the pollution occurred." *A.J. Davinroy Contractors*, 249 Ill. App. 3d at 793.

¶ 35    In addition, petitioners provided little evidence to show that they took "extensive precautions" to prevent the pollution of the CTA waste. See *Perkinson*, 187 Ill. App. 3d at 695 (finding the owner and operator of swine farm was liable for discharge of liquid swine waste into a stream because the pollution source was on the owner's land, the waste facility was under his control and there was no evidence showing that the owner had taken precautions against vandalism). As noted by the Board, Gonzalez's office was 10 minutes from the site and petitioners could have sent a representative to monitor E. King's activities.

¶ 36    Petitioners' reliance on *Phillips Petroleum Co. v. Pollution Control Board*, 72 Ill. App. 3d 217, 390 N.E.2d 620 (1979), is misplaced. The court there held that the evidence was insufficient to show that the owner of a tank car of anhydrous ammonia had sufficient capacity to control the pollution because the car was under the sole control of the transporting railroad when it was punctured in a derailment and released poisonous gas into the air. *Phillips Petroleum*, 72 Ill. App. 3d at 220. In contrast, here the evidence shows petitioners were in control of the site and did not lack the capability of controlling the pollution.

¶ 37    Petitioners argue that Maciel solicited a bribe from Gonzalez and retaliated against him when he refused to pay but provide little evidence in support of the argument. We agree with the Board that the evidence was inconclusive and unsubstantiated and note that this issue has no bearing on petitioner's liability. The Board's finding that Gonzalez and the LLC caused or allowed the open dumping was not against the manifest weight of the evidence.

¶ 38    Petitioners next contend that Gonzalez cannot be held liable for violations of the Act because he is a corporate agent. We agree with the Board that the issue was forfeited because Gonzalez raised it for the first time in his motion for reconsideration. See *Holzer v. Motorola Lighting, Inc.*, 295 Ill. App. 3d 963, 978, 693 N.E.2d 446 (1998) (a new legal theory may not be raised for the first time in a motion to reconsider).

¶ 39    Even assuming the issue was not forfeited, Gonzalez would still be liable because he personally owned the LLC, paid the cleanup fees with SGLI's account, made an agreement with E. King, gave E. King the key to the site and was supervising the site cleanup on March

22, 2006. See *People ex rel. Ryan v. Agpro, Inc.*, 345 Ill. App. 3d 1011, 1028-29, 803 N.E.2d 1007 (2004) (corporate officer was held liable for his personal involvement or active participation in a violation of Environmental Protection Act, where the officer personally ran company's operations at the polluted site, spent a great deal of time at the site, directly supervised his employees and personally applied fertilizer and pesticides to farm fields).

¶ 40      Finally, petitioners contend that they were denied due process based on: the City's selective prosecution of petitioners; the City's false allegations; the City's failure to provide field notes and business cards of the identity of additional witnesses in response to a subpoena; Maciel's false testimony about his FBI training; and Maciel's inconsistent testimony about whether he believed the trucks were loading or unloading waste on the site.

¶ 41      The City contends that petitioners have waived their due process argument. Ordinarily, a constitutional issue is forfeited if it is not raised before an administrative agency, even when the agency lacks the authority to decide it. *Board of Education, Joliet Township High School District No. 204 v. Board of Education, Lincoln Way Community High School District No. 210*, 231 Ill. 2d 184, 205, 897 N.E.2d 756 (2008). But, we may still review such an issue even if it has been waived. *Carpetland U.S.A., Inc. v. Illinois Department of Employment Security*, 201 Ill. 2d 351, 397, 776 N.E.2d 166 (2002).

¶ 42      An administrative hearing comports with due process where the parties are given the opportunity to be heard, the right to cross-examine adverse witnesses and an impartial ruling based on the evidence. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 95, 606 N.E.2d 1111 (1992). A court will find a due process violation only if there is a showing of prejudice. *Sudzus v. Department of Employment Security*, 393 Ill. App. 3d 814, 824, 914 N.E.2d 208 (2009).

¶ 43      Here, petitioners were given a full opportunity to challenge the evidence against them, present evidence and cross-examine the witnesses. Petitioners were not prejudiced by the City's failure to produce Maciel's filed notes and business cards. As noted by the Board, the City turned over customary documents for administrative citation proceedings, and the inspection report and other evidence presented at trial were sufficient for petitioners to challenge the citations. We believe petitioners' argument that the filed notes would have contained exculpatory evidence is speculative and unpersuasive.

¶ 44      Maciel's inconsistent testimony about his FBI training was irrelevant to the primary issues in this case. Maciel's belief about whether the trucks were loading or unloading waste had no effect on petitioners' liability because the Board found the CTA waste had been dumped on the site and other waste was present long after petitioners acquired the site. Petitioners were also not deprived of due process due to the City's alleged selective prosecution because it is within the discretion of the prosecutor to initiate actions for violating the Act. See 415 ILCS 5/42(e) (West 2006); *People v. NL Industries*, 152 Ill. 2d 82, 101-02, 604 N.E.2d 349 (1992). Petitioners were not denied due process of law at the hearing.

¶ 45      The decision of the Illinois Pollution Control Board is confirmed.

¶ 46      Confirmed.