2024 IL App (1st) 221833

No. 1-22-1833

Opinion filed September 26, 2024

Fourth Division

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| HAAAYY, LLC, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 21 CH 5980 |
| | ) | (cons. 21 CH 3730) |
| THE DEPARTMENT OF FINANCIAL AND | ) | |
| PROFESSIONAL REGULATION, | ) | Honorable |
| | ) | Celia Gamrath, |
| Defendant-Appellee. | ) | Judge Presiding. |
| | ) | |

_____

JUSTICE LYLE delivered the judgment of the court, with opinion.
Justices Hoffman and Ocasio concurred in the judgment and opinion.

**OPINION**

¶ 1    Pursuant to the Cannabis Regulation and Tax Act (Act) (410 ILCS 705/1-1 *et seq.* (West 2020)), plaintiff, Haaayy, LLC (Haaayy), applied for a cannabis dispensary license issued by defendant, the Illinois Department of Financial and Professional Regulation (Department). Following the application process, the Department received more applications than licenses available and therefore held a lottery among certain applicants to determine which applicants would be awarded licenses. The Department determined that Haaayy did not qualify for the lottery

and therefore Haaayy did not have an opportunity to obtain a cannabis dispensary license in its region. The Department announced the lottery winners in a final administrative decision and directed any party that wished to challenge the Department's decision to file suit in the circuit court.

¶ 2 Haaayy and its former co-plaintiff filed suit against the Department, seeking declaratory and injunctive relief. The crux of Haaayy's claims was that the Department's determination of which dispensary license applicants should be included in the lottery violated Haaayy's constitutional rights. Haaayy asserted that the Department limited participation in the lottery to applicants that received perfect scores on their applications. Haaayy pointed out that the only applicants that could receive perfect scores were applicants that were majority-owned by military veterans. Haaayy maintained that this preference for military veterans in the application process violated the intention and purpose of the Act. The parties filed cross-motions for summary judgment, and the circuit court granted summary judgment in favor of the Department, finding, *inter alia*, that the preference granted to veterans in the Department's application and lottery process was not unconstitutional.

¶ 3 Haaayy now appeals, contending that the Department violated its rights to procedural due process, substantive due process, and equal protection. Haaayy asserts that the Department violated its right to procedural due process because the Department did not provide Haaayy with an administrative hearing before entering its final administrative decision in contravention of the Administrative Review Law (735 ILCS 5/3-101 to 3-113 (West 2020)). Haaayy contends that the Department violated its substantive due process rights by excluding it from the license lottery for its region solely because it was not majority-owned by veterans. Finally, Haaayy maintains that the Department's proposed remedy, a corrective lottery with blank entries in the place of actual

applicants, violates its rights to equal protection and due process. For the reasons that follow, we affirm the judgment of the circuit court.

¶ 4                                    I. BACKGROUND

¶ 5      The Act, which took effect in June 2019, legalizes the cultivation, sale, and use of cannabis by adults in Illinois. 410 ILCS 705/1-1 *et seq.* (West 2020). Under the Act, the Department is responsible for enforcing its provisions and issuing licenses for cannabis dispensaries. *Id.* § 5-15. The Act directed the Department to issue up to 75 Conditional Adult Use Dispensing Organization Licenses (Licenses) across 17 geographic regions (BLS Regions) in Illinois before May 1, 2020.[1] *Id.* § 15-25. The Department was required to review applications for Licenses and award points to applicants based on the sufficiency of the applicant's submissions for the required information. *Id.* § 15-30(c), (d). For example, the Department could award an applicant 65 points based on its business plan, financials, and floor plan. *Id.* § 15-30(c)(3). An applicant could receive 50 points for their status as a social equity applicant as defined in the Act. *Id.* § 15-30(c)(5). The Act also provided that an applicant would be awarded five points if the applicant was 51% or more controlled or owned by a veteran. *Id.* § 15-30(c)(9). The maximum number of points an applicant could receive if it satisfied all the requirements of section 15-30 was 250 points. *Id.* § 15-30(c). However, if the Department received two or more applications that received equal scores, the Department could award two additional bonus points for a plan to engage in the community, for a maximum total of 252 points. *Id.* § 15-30(c), (d).

¶ 6      On December 9, 2019, through the exercise of its emergency rule making powers, the Department added sections 1291.10 and 1291.50 to the Illinois Administrative Code (as amended,

---

[1]This deadline would later be delayed due to the COVID-19 Pandemic.

now codified at 68 Ill. Adm. Code 1291.10, 1291.50 (2024)) to implement the changes made by the Act. 43 Ill. Reg. 14934 (emergency rule eff. Dec. 9, 2019). The emergency rules related to the lottery process that would take place if there were ties in a particular BLS Region and also provided that, if an unsuccessful applicant sought to challenge the Department's decision, it should do so in the circuit court without first going through the administrative process. *Id.* In the new sections created by the emergency rules, the Department adopted rules providing for how the Licenses would be distributed among the "Tied Applicants." *Id.* The rules provided that under those circumstances, the Department would conduct a lottery among the "Tied Applicants" to determine which applicants would be awarded Licenses. *Id.* at 14939. The Department defined a "Tied Applicant" as "an applicant that has received the same number of application points as one or more other applicants in the same BLS region and would have been awarded a license but for the one or more other applicants that received the same number of application points." *Id.* at 14938. The Department further defined " 'Eligible applicant' " to mean "a tied applicant that is eligible to participate in the process by which a remaining available license is distributed by lot." *Id.* at 14937. The rules provided for how the licenses would be distributed "by lot," which included that the Department would publish a list of eligible applicants and draw a number of eligible applicants equal to five times the number of remaining eligible applicants, with the first-drawn applicant having the first right to a remaining available license, the second-drawn applicant having the second right, and so forth. *Id.* at 14939. The emergency rules were later added to the Illinois Administrative Code as permanent administrative rules at sections 1291.10 and 1291.50. See 68 Ill. Adm. Code 1291.10, 1291.50 (2024).

¶ 7     Haaayy submitted an application for a License for BLS Region 5, which included the Naperville, Chicago, and Elgin areas. In September 2020, the Department notified all applicants

that in each region there were multiple applicants that received the maximum possible score of 252 points. The Department indicated that only those applicants would be considered "Tied Applicants" eligible to participate in the Tied Applicant Lotteries for each region and that all 75 Licenses would be awarded by lottery. If applicants did not receive 252 points, they did not qualify for the lottery and would not have an opportunity to be awarded a License. Haaayy did not qualify for the Tied Applicant Lottery in BLS Region 5.

¶ 8    Shortly thereafter, Haaayy and its former co-plaintiff initiated their action for a temporary restraining order and preliminary injunction against the Department. The parties agreed that the Department would provide Haaayy with the scores it received on its application. After a number of applicants, including Haaayy, raised concerns about how their applications were scored, the Department announced a "Supplemental Deficiency Notice Process" on September 22, 2020. Under the Supplemental Deficiency Notice Process, applicants that did not receive the maximum number of points available on a particular category could submit an amended application exhibit, or request that the Department review any original application exhibit for potential scoring errors or inconsistencies. After Haaayy's application was rescored during Supplemental Deficiency Notice Process, Haaayy received a final score of 245 points, earning all of the possible points except for the five points awarded to veteran-owned applicants and the two available bonus points.

¶ 9    While the Department was conducting the Supplemental Deficiency Notice Process, the Illinois legislature enacted Public Act 102-0098, which amended the Act. Pub. Act 102-98, § 10 (eff. July 15, 2021). In the amendment, the General Assembly also adopted its own definition of "Tied Applicant" as follows:

"[A]n application submitted by a Dispensary Applicant pursuant to Section 15-30 that received the same number of application points under Section 15-30 as the Dispensary

Applicant's final score as one or more top-scoring applications in the same BLS Region and would have been awarded a license but for the one or more other top-scoring applications that received the same number of application points. Each application for which a Dispensary Applicant was required to pay a required application fee for the application period ending January 2, 2020 shall be considered an application of a separate Tied Applicant." *Id.*; 410 ILCS 705/1-10 (West 2022).

¶ 10  The amendment further added definitions for "Eligible Tied Applicant": "[A] Tied Applicant that is eligible to participate in the process by which a remaining available license is distributed by lot pursuant to a Tied Applicant Lottery." Pub. Act 102-98, § 10 (eff. July 15, 2021); 410 ILCS 705/1-10 (West 2022). "Tied Applicant Lottery" was defined as "the process established under 68 Ill. Adm. Code 1291.50 for awarding [Licenses] pursuant to Sections 15-25 and 15-30 among Eligible Tied Applicants." Pub. Act 102-98, § 10 (eff. July 15, 2021); 410 ILCS 705/1-10 (West 2022). Finally, the amendment established two additional lotteries—the "Qualifying Applicant Lottery" and the "Social Equity Justice Involved Lottery"—and authorized the Department to award 55 additional Licenses under each of these lotteries. Pub. Act 102-98, § 10 (eff. July 15, 2021) (amending 410 ILCS 705/15-35 and adding 410 ILCS 705/15-35.10). To participate in the two additional lotteries, an applicant was required to receive at least 85% (213) of the 250 available application points. Pub. Act 102-98, § 10 (eff. July 15, 2021); 410 ILCS 705/1-10, 15-35(a), 15-35.10 (West 2022). The Department later amended its definition of Tied Applicant to mirror the definition in the Act. 46 Ill. Reg. 20783, 20793-94 (eff. Dec. 13, 2022); see 68 Ill. Adm. Code 1291.10 (2024).

¶ 11  The Department conducted the three lotteries in July and August of 2021. Haaayy, as result of its 245-point application score, participated in the two additional lotteries established by Public

Act 102-98, but not the Tied Applicant Lottery. The Department maintained that participation in the Tied Applicant Lottery was limited to those applicants with a perfect 252-point application score. Following the three lotteries, the Department issued its final administrative decision on September 3, 2021, publishing the names of the lottery winners.

¶ 12    Haaayy filed an amended complaint in the circuit court, challenging the Department's final administrative decision. Its complaint was eventually severed from its co-plaintiff's complaint and then consolidated with a number of other applicants who sought judicial review of the Department's final administrative decision in *In re* Cannabis Dispensary Litigation, No. 21-CH-3730 (Cir. Ct. Cook County).

¶ 13    Before the circuit court, the Department proposed for a limited remand to conduct "corrective lotteries." Through this procedure, the Department would hold lotteries for all of the plaintiffs in the *In re* Cannabis Dispensary Litigation that claimed they were wrongfully excluded from the Tied Applicant Lottery in their region before the circuit court determined the merits of any individual plaintiff's claims. The Department explained that it would use "blank entries" to give the plaintiffs the same odds they would have received if they were included in the original lotteries. Under the Department's proposal, if a particular plaintiff obtained a winning position in the corrective lottery, that plaintiff could then have the merits of its claims addressed by the circuit court.

¶ 14    Haaayy objected to the proposed corrective lottery procedure, contending that the motion was a "red herring" designed to alleviate the Department of its responsibility to file the administrative record and that the corrective lotteries were "mathematically implausible." Haaayy maintained that the Department's "blank entry" method could not replicate the odds of the original lotteries because if Haaayy and other plaintiffs in the consolidated litigation had not been

wrongfully excluded from the original lotteries, their participation would have changed the odds for all of the other applicants who were included in those lotteries. Haaayy asserted that the only proper remedy was to redo the original lotteries with all of the applicants so that all applicants could be subjected to the same odds. Haaayy recognized that this resolution would harm the winners of the original lotteries and therefore asserted that the only equitable solution was corrective lotteries without blank entries.

¶ 15    The circuit court rejected Haaayy's objection to the limited remand and granted the remedy the Department requested for the corrective lotteries. However, the court permitted any plaintiff to opt out of the limited remand. Haaayy elected to opt out.

¶ 16    The parties thereafter filed cross-motions for summary judgment. In its motion for summary judgment, Haaayy contended that the Department violated its constitutional rights by excluding it from the Tied Applicant Lottery in BLS Region 5 solely on the basis that it was not majority veteran-owned. Haaayy asserted that there was no rational relationship between military service and the publicly stated social equity interest and the objectives of the Act. Haaayy maintained that it had a protectable property interest in the License and the Department "arbitrarily and deceptively" applied the veteran's preference as eligibility criteria for the Tied Applicant Lottery. Haaayy contended that eligibility for the Tied Applicant Lottery should have been based on a grading scale, rather than a singular score, because, although veteran ownership was listed as optional on the application, it was determinative of whether applicants could participate in the Tied Applicant Lottery.

¶ 17    The Department asserted that the court should deny Haaayy's motion because the "modest benefit" of five points to majority veteran-owned applicants was rationally related to the purpose and intent of the Act. The Department maintained that it uniformly applied the veterans-points

provision when scoring the applications and that all applicants knew at the time they submitted their applications that the Department would award five points to applicants that were majority-owned by veterans.

¶ 18    The circuit court ruled on the parties' motions in a written order. The court found that the motions raised a single question of constitutional law: "Whether the Department violated [Haaayy's] substantive due process rights under the United States and Illinois Constitutions by excluding [Haaayy] from the Tied Applicant Lottery for BLS Region 5 because it did not receive the five points allocated for veteran status in its applications for" Licenses under the Act. The court found that the five-point benefit granted to veteran-owned applicants was supported by rational justifications. The court noted that numerous cases had upheld a preference for veteran status, noting the objectives of promoting patriotism, rewarding honorable service, and recognizing the likelihood of veterans to be effective owners due to their discipline and loyalty.

¶ 19    The court found Haaayy's reliance on the Illinois Supreme Court's decision in *Marallis v. City of Chicago*, 349 Ill. 422 (1932), "misplaced," noting that the statute at issue in that case unconstitutionally rewarded unqualified veterans solely based on their veteran status. In this case, by contrast, the circuit court found that under the Act, "mere veteran status" was not sufficient to gain entry to the Tied Applicant Lottery because all applicants were required to provide adequate business plans and otherwise establish their qualifications. The court noted that veteran status accounted for "just 2%" of the points available. The court found that assigning points for veteran status was an effective means of accomplishing the legislative goals and did not impermissibly undercut the social equity provisions of the Act. The court therefore granted summary judgment in favor of the Department and against Haaayy. The court further entered a finding under Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016) that its judgment was final and appealable. On

November 23, 2022, Haaayy filed a timely notice of appeal from the circuit court's order. We find that we have jurisdiction to consider the merits of this appeal pursuant to Rule 304(a).

¶ 20                                    II. ANALYSIS

¶ 21    On appeal, Haaayy contends that the Department violated the Administrative Review Law and Haaayy's right to procedural due process when it issued its September 3, 2021, final administrative decision without holding an administrative hearing. Haaayy further asserts that the Department violated its substantive due process rights by excluding it from the Tied Applicant Lottery solely on the basis that it was not majority veteran-owned. Finally, Haaayy maintains that the Department's proposed corrective lotteries using blank entries violates Haaayy's rights to equal protection and due process.

¶ 22                              A. Summary Judgment

¶ 23    In the circuit court, the parties filed cross-motions for summary judgment. Where parties file cross-motions for summary judgment, they concede that no material questions of fact exist and invite the court to decide the issues based on the record. *Pielet v. Pielet*, 2012 IL 112064, ¶ 28. The mere filing of cross-motions for summary judgment, however, does not establish that there is no issue of material fact, and the court should grant summary judgment only where the pleadings, depositions, admissions, and affidavits of file—when viewed in a light most favorable to the nonmoving party—show that there is no genuine issue as to any material fact and that the moving party is clearly entitled to judgment as a matter of law. *Id.* ¶¶ 28-29 (citing 735 ILCS 5/2-1005(c) (West 2006)). We review *de novo* the circuit court's ruling on cross-motions for summary judgment. *Id.* ¶ 30.

¶ 24                               B. Administrative Hearing

¶ 25    Haaayy first contends that the circuit court erred in granting summary judgment in favor of the Department where the Department entered its September 3, 2021, final administrative decision announcing the winners of the three lotteries without holding administrative hearings to create a record of the proceedings. Haaayy maintains that, pursuant to the Administrative Review Law (735 ILCS 5/3-101 to 5/3-113 (West 2020)), a record of proceedings is a prerequisite to challenge an administrative ruling in the circuit court. Haaayy further asserts that pursuant to the Administrative Review Law, due process required that the Department offer Haaayy an opportunity to challenge the Department's administrative decision at an administrative hearing before it challenged the decision in the circuit court.

¶ 26    Haaayy's contention that the Department was required to provide it with an opportunity for an administrative hearing or another method of administrative review is based in part on sections 3-108(b) and 3-110 of the Administrative Review Law (*id.* §§ 3-108(b), 3-110), which govern judicial review of administrative decisions. Under section 3-108(b), in its answer to an administrative review complaint, an administrative agency must file "the original or a certified copy of the entire record of proceedings under review, including such evidence as may have been heard by it and the findings and decisions made by it." *Id.* § 3-108(b). Section 3-110 concerns the scope of judicial review. *Id.* § 3-110. That section provides:

> "No new or additional evidence in support of or in opposition to any finding, order, determination or decision of the administrative agency shall be heard by the court. The findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct." *Id.*

¶ 27    Haaayy asserts that these two sections demonstrate that the Administrative Review Law contemplates an administrative hearing where a record of proceedings is produced prior to a complaint for judicial review. Haaayy maintains that without an administrative hearing, the Department cannot meet its burden under section 3-108(b) to produce a record of proceedings. Haaayy also contends that it was deprived of the opportunity to develop an administrative record pursuant to section 3-110 and that section's mandate that no additional evidence may be presented to the circuit court implies that an administrative hearing must be held before a party seeks judicial review.

¶ 28    The Department responds that Haaayy expressly waived this challenge for review where it asserted in the circuit court that its claims were based on a single question of constitutional law and could be decided by the circuit court without a record of proceedings. The Department further asserts that neither due process nor any statutory authority required it to give Haaayy an individual hearing regarding its License application. The Department maintains that if the General Assembly intended for the Department to provide each License applicant with an individualized hearing, it would have expressly provided for such a hearing in the Act.

¶ 29    We will first address the Department's contention that Haaayy waived its challenge to the administrative record by asserting in the circuit court that its claim could proceed without a record of proceedings. In Haaayy's motion for remand and severance and in the reply to the Department's objection to that motion, Haaayy contended that the circuit court should sever its claims from the consolidated litigation because its claims could be decided without a record of proceedings. Haaayy asserted that because its judicial review claim was based on a "singular constitutional due process question of law," the court could consider that claim without a record of proceedings.

¶ 30    Haaayy maintained that if its claims were not severed, it would suffer "substantial prejudice" by being remanded back to the Department to allow the Department to create a record of proceedings. Haaayy therefore asked the circuit court to sever its claims from the other plaintiffs in the consolidated case and allow its "judicial review claim to proceed in the circuit court without a 'record of proceedings' so its singular constitutional question of law can be decided *de novo* by the circuit court."

¶ 31    Ultimately, however, the circuit court denied Haaayy's motion for severance. In the same order, the court ordered the Department to file a record of proceedings as its answer to the complaints for judicial review.

¶ 32    Haaayy maintains before this court that it has not waived its challenge to the Department's failure to produce a record of proceedings because the "preservation of issues standard" is not applicable in administrative review proceedings. Haaayy points out that section 3-110 of the Administrative Review Law explicitly prevents the parties from introducing new evidence on judicial review and therefore Haaayy was prevented from introducing any factual issues where the Department did not provide Haaayy with a hearing where it could have done so. Haaayy asserts that "any waiver argument [the Department] asserts is nothing more than fruit from the poisonous tree of [the Department's] denial of [ ] an administrative hearing in violation of the [Administrative Review Law] and due process." Haaayy contends that we should also ignore any waiver in this case because this issue is likely to recur.

¶ 33    Haaayy attempts to frame this issue as one subject to forfeiture principles, rather than waiver principles. Waiver is the intentional relinquishment of a known right, while forfeiture is the failure to make the timely assertion of a right. *Gallagher v. Lenart*, 226 Ill. 2d 208, 229 (2007). Haaayy contends that because of the limitations of section 3-110, it could not have raised this issue

in the circuit court without first raising it before the Department at an administrative hearing. Haaayy maintains that we should therefore excuse any forfeiture (which it calls "waiver"), based on the Department's unconstitutional denial of an administrative hearing.

¶ 34    As discussed, however, Haaayy did not simply forfeit review of this issue by failing to raise it below. Instead, Haaayy *did* address this issue before the circuit court and specifically requested that the circuit court ignore the lack of a record of proceedings from an administrative hearing and address Haaayy's claims regardless, solely based on the legal issue presented. This course of conduct, intentionally relinquishing what Haaayy now asserts was a known right, is waiver; specifically, it is invited error. Invited error prohibits a party from requesting to proceed in one manner and then contending on appeal that the requested action was error. *Gaffney v. Board of Trustees of the Orland Fire Protection District*, 2012 IL 110012, ¶ 33. The doctrine of invited error goes beyond " ' "mere waiver" ' " such that the traditional exceptions to the waiver rule do not apply. *LifeEnergy, LLC v. Illinois Commerce Comm'n*, 2021 IL App (2d) 200411, ¶ 76 (quoting *In re Detention of Swope*, 213 Ill. 2d 210, 218 (2004), quoting *People v. Villarreal*, 198 Ill. 2d 209, 227 (2001)).

¶ 35    In this case, Haaayy asserted before the circuit court that it claims could be decided without an administrative hearing, where a record of proceedings could be produced, and, in fact, asserted that it would be prejudiced by such hearing, but is now claiming on review that the lack of a hearing was in error. The waiver that results where a party invites an error applies in cases of judicial review of administrative decisions. *Board of Education of Valley View Community Unit School District No. 365-U v. Illinois State Board of Education*, 2013 IL App (3d) 120373, ¶ 44. If Haaayy believed, as it now asserts, that an individualized hearing where a record of proceedings could be

produced was so integral to its claims, it would not have argued the opposite before the circuit court.

¶ 36     Matters of waiver aside, we find that Haaayy's contention that the Department was required to hold an administrative hearing in this case so that it could create a "record of proceedings" is meritless. First, we observe that the Department *did* file a record of proceedings in this case. That record of proceedings contained more than 30 documents, including the License application, the rules for tie-breakers, the supplemental deficiency process notice, the lottery timeline, the list of applicants entered into the Tied Applicant Lottery, the list of numbers drawn in the lottery, and the September 3, 2021, final administrative notice. The Department therefore met its burden under section 3-108(b).

¶ 37     Haaayy nonetheless maintains that it was entitled to its own hearing prior to seeking judicial review, where the Department could create an individualized record of proceedings, rather than using the same record for every plaintiff in the consolidated litigation. Haaayy asserts that the Illinois Administrative Procedure Act (Procedure Act) (5 ILCS 100/1-1 *et seq.* (West 2020)) requires an administrative hearing before an administrative agency can issue a final administrative decision. Haaayy contends that these hearings must be adjudicatory or quasi-judicial nature where the parties involved present arguments on disputed facts before an impartial factfinder.

¶ 38     The Procedure Act applies to every agency in Illinois, which the Procedure Act broadly defines as each department of the State and each administrative unit of the State government that is created pursuant to statute. *Nyhammer v. Basta*, 2022 IL 128354, ¶ 38 (citing 5/ ILCS 100/1-5, 1-20 (West 2018)). Article 10 of the Procedure Act (5 ILCS 100/art. 10 (West 2018)) governs administrative hearings and limits the application of the Procedure Act to " 'contested cases.' " *Nyhammer*, 2022 IL 128354, ¶ 39. Section 1-30 of the Procedure Act defines a "contested case"

as follows: " 'Contested case' means an adjudicatory proceeding (not including ratemaking, rulemaking, or quasi-legislative, informational, or similar proceedings) in which the individual legal rights, duties, or privileges of a party are *required by law* to be determined by an agency only after an opportunity for a hearing." (Emphasis added.) 5 ILCS 100/1-30 (West 2020).

¶ 39    The plain language of the Procedure Act therefore applies the "contested case" section only where required by law. As our supreme court explained in *Nyhammer*, there must be some legal authority—such as a statute, constitutional right, or administrative regulation—that requires an agency to conduct a hearing when making the decision at issue. *Nyhammer*, 2022 IL 128354, ¶¶ 41-43. In order to determine whether an administrative agency was required to conduct a hearing prior to making a final administrative decision that affected the rights, duties, or privileges of a party, we must examine the relevant statutory, regulatory, and constitutional provisions implicated. *Id.* ¶ 43. We will first examine whether the Act required the Department to hold a hearing in this case.

¶ 40    When the General Assembly intends to require a hearing before an administrative agency makes an administrative decision, "it does so explicitly and it does so in language precisely tracking section 1-30 of the Procedure Act." *Id.* ¶ 45. As such, the General Assembly will specifically provide in the statute that the party should have "an opportunity for a hearing" or an "opportunity to be heard." *Id.* (collecting authority). Therefore, we will examine the provisions of the Act in order to determine whether the Department was required to provide Haaayy with a hearing in this case prior to judicial review.

¶ 41    Here, the Department awarded licenses pursuant to section 15-25 of the Act. That section sets forth the number of Licenses the Department shall issue, the geographic regions where the Licenses will be awarded, and the requirements for application. 410 ILCS 705/15-25 (West 2022).

Section 15-30 provides the selection criteria for the Department to consider in awarding Licenses pursuant to section 15-25, and section 15-30.20 sets forth the timing and requirements of the Tied Applicant Lottery. *Id.* §§ 15-30, 15-30.20. Notably, none of these sections provide for "an opportunity for a hearing" or an "opportunity to be heard."

¶ 42    Haaayy, however, points to sections 55-45 and 55-50 of the Act (*id.* §§ 55-45, 55-50) in contending that the General Assembly did intend for hearings to take place before the Department issued its final administrative decision. Section 55-45(b) provides: "Administrative hearings related to the duties and responsibilities assigned to the Department of Financial and Professional Regulation and dispensing organization agents shall be conducted under the Department of Financial and Professional Regulation's rules governing administrative hearings." *Id.* § 55-45. Section 55-50 provides the procedures by which a party to an administrative hearing under the Act may petition for rehearing following the hearing. *Id.* § 55-50. Haaayy maintains that these two sections demonstrate that an administrative hearing was required in this case because section 55-45 provides that hearings "shall be conducted." *Id.* § 55-45. Haaayy further contends that the General Assembly would not have provided procedures for rehearing in section 55-50 if it did not intend for hearings to take place.

¶ 43    We first observe that Haaayy's assertion that section 55-45 provides that administrative hearings "shall be conducted" is based on an intentionally deceptive selective quotation from the statute. A plain reading of section 55-45 shows that when the Department does conduct hearings under the Act, it will do so pursuant to its own rules governing those hearings. Section 15-5 of the Act provides that the Department *may* "[c]onduct hearings on proceedings to refuse to issue or renew licenses or to revoke, suspend, place on probation, reprimand, or otherwise discipline a license[e] under this Article or take other nondisciplinary action." *Id.* § 15-5(d)(4). Section 15-160

sets forth the notice and hearing requirements for when the Department takes disciplinary action against an applicant or licensee. *Id.* § 15-160. Section 55-45 therefore provides that when the Department holds hearings under these sections, it "shall" do so under its own rules governing those hearings. These sections demonstrate that the General Assembly was aware that it could mandate hearings for certain actions of the Department under the Act. The fact that the General Assembly chose to not require individualized hearings for each License applicant demonstrates that the General Assembly did not contemplate the Department holding individualized hearings, and, therefore, Haaayy was not entitled to such a hearing. The sections of the Act concerning the lotteries required the Department simply to publish the certified results of the lotteries, which the Department did in its September 3, 2021, final administrative decision.

¶ 44     We also find that the Department did not violate Haaayy's right to procedural due process by not conducting an individualized administrative hearing on Haaayy's License application. The fourteenth amendment to the United States Constitution (U.S. Const., amend. XIV, § 1) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, § 2) both provide that no person shall be deprived of life, liberty, or property without due process of law. *People v. Pepitone*, 2018 IL 122034, ¶ 13. " 'Procedural due process bars governmental action that infringes upon a protected interest when such action is arbitrary because it was not preceded by procedural safeguards.' " *Wingert v. Hradisky*, 2019 IL 123201, ¶ 29 (opinion of Thomas, J., joined by Karmeier, C.J., and Garman, J.) (quoting *Pepitone*, 2018 IL 122034, ¶ 13). The due process clauses of the United States and Illinois Constitutions are triggered only when a constitutionally protected liberty or property interest is at stake. *Nyhammer*, 2022 IL 128354, ¶ 64. Haaayy maintains that it had a protectable property interest in the Licenses for which it applied. The Department "does not dispute" that Haaayy had a protectable property interest in being eligible to receive a License under

the Act if it received the points necessary to participate in a tie-breaker lottery, but nonetheless asserts that due process did not require a "trial-type" hearing on Haaayy's application.

¶ 45    Despite the Department's concession on this issue, we do not necessarily agree that Haaayy had a protectable property interest in its eligibility to receive a License. "To have a constitutionally protected property interest, a plaintiff must show that he has a legitimate claim of entitlement to it." *Akmakjian v. Department of Professional Regulation*, 287 Ill. App. 3d 894, 896 (1997). This legitimate claim of entitlement may arise from a statute, regulation, municipal ordinance, or express or implied contract. *Id.* "A unilateral expectation of a protected interest is insufficient to establish a claim of entitlement." *Id.* (citing *Groenings v. City of St. Charles*, 215 Ill. App. 3d 295, 307 (1991)).

¶ 46    Haaayy relies on *Quick v. Illinois Department of Financial & Professional Regulation*, 468 F. Supp. 3d 1001 (N.D. Ill. 2020), in contending that it had a protectable property interest in a License. However, the federal district court in that case merely found that the plaintiffs sufficiently pled that they had a property interest in a license under the Compassionate Use of Medical Cannabis Program Act (410 ILCS 130/1 *et. seq.* (West 2020)) sufficient to survive a motion to dismiss. *Quick*, 468 F. Supp. 3d at 1008. The Department argued that the plaintiffs did not have a protectable property interest because the Compassionate Use of Medical Cannabis Program Act required applicants to apply to separate districts, required applicants to pay for each application, and permitted the Department to use a competitive scoring system when more than one applicant applied for a license. *Id.* The federal district court found that these arguments were better suited for summary judgment. *Id.* Notably, the plaintiffs in *Quick* alleged that they were the only applicants in their district that were qualified applicants with a compliant property in a district with an available license. *Id.* at 1007. The plaintiffs pointed out that the Compassionate Use of Medical

Cannabis Program Act *required* the Department to issue a certain number of licenses if there were qualified applicants and available licenses in the district. *Id.* at 1007-08. In contrast, as discussed below, Haaayy was not the only such applicant in its region. In fact, there were hundreds of applicants for comparably few Licenses and many of those applicants scored more points than Haaayy in the "competitive scoring system" outlined in the Act. Even assuming Haaayy received the necessary number of points to participate in a tie-breaker lottery, the Department was under no obligation to issue Haaayy a License unless it obtained a winning position in that lottery. See *Groenings*, 215 Ill. App. 3d at 307. Haaayy's entitlement to a License was thus much more tenuous than the plaintiffs in *Quick*. In any event, federal district court orders are not precedential or binding on this court. *Justin Time Transportation, LLC v. Harco National Insurance Co.*, 2014 IL App (5th) 130124, ¶ 21.

¶ 47    Nevertheless, even where a protectable property interest is involved, due process does not necessarily require an administrative proceeding in the nature of a judicial proceeding. *Hayashi v. Illinois Department of Financial & Professional Regulation*, 2014 IL 116023, ¶ 40; see *Consiglio v. Department of Financial & Professional Regulation*, 2013 IL App (1st) 121142, ¶ 18 ("Procedural due process does not necessarily require a proceeding that is akin to a judicial proceeding; nor does it require a hearing in every instance a government action impairs a private interest."). Instead, courts should consider three factors in evaluating a due process claim:

> "(1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest and the value, if any, of any additional or substitute procedural safeguards; and (3) the government's interest, including the administrative burdens that any additional or substitute procedural safeguards would entail." *Hayashi*, 2014 IL 116023, ¶ 40.

¶ 48    For the first factor, as noted, the Department concedes that Haaayy had a viable protectable property interest. With regard to the third factor, however, it is clear that requiring the Department to hold individual hearings for each License applicant, or even requiring a hearing for each License applicant that believed it was wrongfully denied a License or a place in one of the lotteries, would place an enormous burden on the Department. Haaayy also does not explain how a hearing would help alleviate the risk of an erroneous deprivation of its rights. Haaayy does not challenge its application score or the Department's evaluation of its exhibits. It does not challenge the lottery procedure. In fact, it does not identify any factual issues or evidence that it would have presented at an administrative hearing or any factual matters that required development at such a hearing.

¶ 49    For these same reasons, we find that Haaayy has failed to demonstrate that it was prejudiced by any alleged due process violation. "A court will find a due process violation only if there is a showing of prejudice." *Gonzalez v. Pollution Control Board*, 2011 IL App (1st) 093021, ¶ 42 (citing *Sudzus v. Department of Employment Security*, 393 Ill. App. 3d 814, 824 (2009)). Haaayy has not identified any evidence, witnesses, or arguments that it was not able to present to the Department based on the lack of an individualized hearing. Rather, Haaayy solely raises constitutional claims.

¶ 50    Haaayy acknowledges that its claims are based solely on constitutional issues, but asserts that it risked forfeiting these issues by not raising them first before the Department at an administrative hearing. Although parties are encouraged to raise constitutional issues before an administrative agency in order to preserve them for judicial review, it is well-settled that agencies lack the authority to decide constitutional issues. *Board of Education, Joliet Township High School District No. 204 v. Board of Education, Lincoln Way Community High School District No 210*, 231 Ill. 2d 184, 205 (2008); see *Cinkus v. Village of Stickney Municipal Officers Electoral Board*,

228 Ill. 2d 200, 214 (2008) (noting that the supreme court has advised that a party in an administrative proceeding should assert a constitutional challenge on the record despite the fact that "an administrative agency lacks the authority to declare a statute unconstitutional, or even to question its validity"). However, where parties are prevented from raising these issues before the administrative agency, either as a result of statutory limitations or where the issue is beyond the scope of the administrative review law, "there can be no forfeiture." *Joliet Township High School District*, 231 Ill. 2d at 205. As such, the circuit court and this court alike considered Haaayy's constitutional arguments without contemplating forfeiture. Haaayy has not identified any evidence or arguments that it was not able to present to the circuit court or this court as a result of the lack of a hearing. Neither the circuit court nor this court found that Haaayy had forfeited any arguments by not raising them first before the Department. We therefore find that procedural due process did not require the Department to hold an individual hearing on Haaayy's License application and that Haaayy was not prejudiced by any alleged violation of due process.

¶ 51    Accordingly, we find that the Act did not require the Department to hold administrative hearings prior to issuing its final administrative decision, and we find that the Department did not violate Haaayy's right to procedural due process by not holding an individualized hearing.

¶ 52                                C. Tied Applicant Lottery

¶ 53    Haaayy next contends that the Department violated its substantive due process rights by excluding it from the Tied Applicant Lottery on the sole basis that it was not majority veteran-owned. Haaayy asserts that the Department's determination that only applicants that achieved a perfect 252-point score could qualify for the Tied Applicant Lottery violated the Act's social equity objectives because under the Department's interpretation, no applicant could obtain a License unless it was majority-owned by a veteran. Haaayy maintains that the Department's

refusal to change course even after the General Assembly amended the Act to create its own definition of "Tied Applicant" demonstrates that the Department's decision violated the purpose and intent of the Act.

¶ 54     Article 7 of the Act is titled "Social Equity in the Cannabis Industry." 410 ILCS 705/7-1 to 7-30 (West 2022). In section 7-1, the General Assembly recognized the need to reduce the barriers to ownership of cannabis dispensing organizations. *Id.* § 7-1(a). The General Assembly recognized that since the establishment of the Compassionate Use of Medical Cannabis Program Act in 2014, only a small number of businesses possessed the licenses to dispense and cultivate cannabis. *Id.* This level of ownership did not "sufficiently meet the General Assembly's interest in business ownership that reflects the population of the State of Illinois and that demonstrates the need to reduce barriers to entry for individuals and communities most adversely impacted by the enforcement of cannabis-related laws." *Id.*

¶ 55     To that end, the General Assembly declared that a "social equity program" should be established. *Id.* § 7-1(b). The General Assembly noted that certain people, groups, and communities had been disproportionately affected as a result of drug laws and the arrests and incarcerations that occurred due to those laws. *Id.* § 7-1(c)-(e). In the interest of remedying the harms caused by the "disproportionate enforcement of cannabis-related laws," the General Assembly declared that a social equity program should offer "financial assistance and license application benefits to individuals most directly and adversely impacted by the enforcement of cannabis-related laws who are interested in starting cannabis business establishments." *Id.* § 7-1(h). To accomplish that goal, the General Assembly created the Cannabis Business Development Fund to provide funding to social equity applicants (*id.* § 7-10), provide loans and grants to social equity applicants (*id.* § 7-15) and provide fee waivers for social equity applicants (*id.* § 7-20). The

General Assembly also demonstrated the social equity objectives of the Act through the application scoring process, providing that an applicant's status as a social equity applicant would be worth 50 out of possible 250 points.[2] *Id.* § 15-30(c)(5).

¶ 56 As discussed, following the Department's application scoring process and the Supplemental Deficiency Notice Process, the Department received more applications with 252-point scores than it had Licenses to dispense. The Act provided the Department with 47 Licenses to dispense in the BLS region where Haaayy applied for Licenses. In that region, the Department received 901 applications that received a score of 252 points. In order to determine which of those applicants should receive a License, the Department established its definition of Tied Applicant and established the Tied Applicant Lottery. The Department's original definition of Tied Applicant, as reflected in its emergency rules adopted on December 9, 2019, defined a Tied Applicant as "an applicant that has received the same number of application points as one or more other applicants in the same BLS region and would have been awarded a license but for the one or more other applicants that received the same number of application points." 43 Ill. Reg. 14934, 14938 (emergency rule eff. Dec. 9, 2019).

¶ 57 Haaayy maintains that this definition of Tied Applicant created an "absolute" preference for veterans that undermined the social equity objectives of the Act because only those applicants that were majority-owned by veterans could achieve a 252-point score. Haaayy asserts that the Department's decision to limit the Tied Applicant Lottery to veteran-owned applicants violated Haaayy's right to substantive due process.

---

[2]Not including the two bonus points reserved for tie-breaking purposes. 410 ILCS 705/15-30(d) (West 2022).

¶ 58    Substantive due process bars governmental action that infringes upon a protected interest when such action is itself arbitrary. *Pepitone*, 2018 IL 122034, ¶ 13. The first step in addressing a claim that a statute violates the due process guarantees of the United States and Illinois Constitutions is to determine the nature of the right purportedly infringed upon. *Kopf v. Kelly*, 2024 IL 127464, ¶ 34. The "threshold" question is whether the statute restricts or regulates a fundamental right. (Internal quotation marks omitted.) *Id.* ¶ 35 (quoting *Hayashi*, 2014 IL 116023, ¶ 28). If so, the statute must be examined under strict scrutiny and will be upheld only if it is necessary to promote a compelling state interest and narrowly tailored to effectuate only that interest. *Id.*

¶ 59    Here, the parties agree that the Act's licensing scheme does not restrict or regulate a fundamental right. " 'Where the statute does not affect a fundamental constitutional right, the test for determining whether the statute complies with substantive due process is the rational basis test.' " *Id.* ¶ 36 (quoting *In re J.W.*, 204 Ill. 2d 50, 67 (2003)). To satisfy the rational basis test, "a statute need only bear a rational relationship to the purpose the legislature sought to accomplish in enacting the statute." *In re J.W.*, 204 Ill. 2d at 67. "Pursuant to this test, a statute will be upheld if it 'bears a reasonable relationship to a public interest to be served, and the means adopted are a reasonable method of accomplishing the desired objective.' " *Id.* (quoting *People v. Adams*, 144 Ill. 2d 381, 390 (1991)).

¶ 60    Haaayy first contends that the General Assembly did not intend for there to be any preference for veteran-owned applicants under the Act and that it was only the Department's scoring process and definition of Tied Applicant that created this preference. However, the plain language of the Act refutes Haaayy's position.

¶ 61 Initially, we observe that the General Assembly chose to award five points to applicants that were majority-owned by veterans. 410 ILCS 705/15-30(c)(9) (West 2022). This demonstrates that the General Assembly intended the Department to give a minor, five-point preference to veteran-owned applicants in the scoring process. Other provisions of the Act also show that the General Assembly was interested in attracting veteran-owned businesses to the cannabis industry. Section 7-10 of the Act, which creates the Cannabis Business Development Fund, provides that the fund should be used "to conduct any study or research concerning the participation of minorities, women, *veterans*, or people with disabilities in the cannabis industry, including, without limitation, barriers to such individuals entering the industry as equity owners of cannabis business establishments." (Emphasis added.) *Id.* § 7-10(a)(6). Section 7-30 requires each cannabis business establishment licensed under the Act to report information to the Illinois Cannabis Regulation Oversight Officer. *Id.* § 7-30. The purpose of this reporting is to identify the percentage of licenses provided to "Social Equity Applicants and to businesses owned by minorities, women, *veterans*, and people with disabilities," the total number of employees of the licensees who meet the "definition of Social Equity Applicant or who are minorities, women, *veterans*, or people with disabilities," and the total number of contractors and subcontractors in the cannabis industry who "meet the definition of a Social Equity Applicant or who are owned by minorities, women, *veterans*, or people with disabilities." (Emphases added.) *Id.* § 7-30(1)-(3).

¶ 62 These considerations are reflected in the legislative history of the Act. In debating House Bill 1438, which would eventually become the Act, Representative Kelly Cassidy discussed a "disparity study" that would take place after all the Licenses had been distributed to determine whether the Social Equity Applicant Program in the Act had achieved its desired outcome. 101st Ill. Gen. Assem., House Proceedings, May 31, 2019, at 73-74. Representative Emmanuel Welch

asked if the disparity study would also look at how many businesses were owned by "minorities, women, *veterans*, and people with disabilities." (Emphasis added.). *Id.* at 74 (statements of Representative Welch). Representative Cassidy responded that it would.

¶ 63    Haaayy asserts, however, that there is no rational relationship between military service or patriotism and the Act's stated interest and intent to lower the barriers of entry into the Illinois cannabis industry for social equity applicants. First, we recognize that the rational basis test does not require the General Assembly to state its rational basis or make a legislative finding in order to find that a rational relationship exists. *Cutinello v. Whitley*, 161 Ill. 2d 409, 420 (1994). "It requires only that there be a reasonable relationship between the challenged legislation and a conceivable, and perhaps unarticulated, governmental interest." *Id.* Our supreme court has long held that the General Assembly may rationally provide preferential statutory treatment for veterans in a variety of scenarios. For example, in *Denton v. Civil Service Comm'n*, 176 Ill. 2d 144 (1997), the supreme court upheld an "absolute" hiring preference for veterans for civil service positions. The supreme court concluded that

> "[w]hether and to what extent veterans preferences should be granted are matters for legislative determination. Hiring preferences for veterans have traditionally been adopted to reward veterans for the sacrifice of military service, to ease the transition from military to civilian life, to encourage patriotic service, and to attract loyal and well-disciplined people to civil service occupations." *Id.* at 153.

See *People ex rel. Sellers v. Brady*, 262 Ill. 578, 594 (1914) (" 'It may be said that, other qualifications being equal, there are reasons to believe that a veteran soldier or sailor often will make a better civil officer than a person who never has been subjected to the discipline of service in war, and it is distinctly a public purpose to promote patriotism, and to make conspicuous and

honorable any exhibition of courage, constancy and devotion to the welfare of the State shown in the public service.' " (quoting *Brown v. Russell*, 43 N.E. 1005, 1009 (Mass. 1896))). Here, too, the General Assembly may have sought to reward veterans for the sacrifice of military service, to ease the transition to civilian life, or to attract loyal and well-disciplined people to the cannabis industry.

¶ 64    Haaayy nevertheless maintains that the Act demonstrated a preference for social equity applicants, not veteran-applicants. Haaayy does not dispute, however, that a statute can have more than one objective. See *Crusius v. Illinois Gaming Board*, 216 Ill. 2d 315, 331-32 (2005) ("[*Fitzgerald v. Racing Ass'n of Central Iowa*, 539 U.S. 103 (2003), recognizes] the principle that, for purpose of rational basis review, not every provision in a law must share a single objective ***."). While the scoring guidelines expressed a significant preference for social equity applicants, awarding them 50 points, they also evinced a modest preference for veteran-owned applicants by awarding them five points. Haaayy's argument also ignores that each of the veteran-owned applicants that participated in the Tied Applicant Lottery were also social equity applicants; if they were not, they could not have reached 252 application points.

¶ 65    For these reasons, we find Haaayy's reliance on *Marallis*, 349 Ill. 422, unpersuasive. In that case, the appellants were veterans who peddled goods and merchandise pursuant to a statute that permitted veterans " 'to vend, distribute, hawk and peddle goods, wares, fruits or merchandise, not prohibited by law, in any county, town, village, incorporated city or municipality in the State of Illinois." (Internal quotation marks omitted.) *Id.* at 423; see Ill. Rev. Stat. 1931, ch. 24, §§ 673, 674 (Smith-Hurd 1931). Section 1 of the legislation provided that a veteran could peddle goods for himself without obtaining a license. *Marallis*, 349 Ill. at 424. Section 2 of the legislation provided that a veteran could obtain a license, without paying the customary fee, simply by presenting his certificate of honorable discharge to the clerk. *Id.*

¶ 66    The defendant municipalities prevented the veterans from peddling goods, and the veterans sought an injunction. *Id.* The veterans asserted that they were entitled to the privileges and exemptions granted to them by the legislation. *Id.* at 424-25. The supreme court determined that

> "the ultimate question in the present case is whether an honorable discharge from the military, naval or marine service is a reasonable basis for the exemption of the holder of such a discharge from appropriate regulation and the payment of a license fee which all other persons desiring such a license are required to pay." *Id.* at 432.

¶ 67    The supreme court found that there was no rational basis for the exemptions because the legislation authorized the exemption "without regard to the length or character of their military, naval or marine service, their sound or debilitated condition of body or their affluence or poverty." *Id.* The supreme court noted that, after discharge, the soldiers or sailors returned to civilian life and became a part of the community in which they lived, enjoying the same rights and being subject to the same burdens as other citizens in the same jurisdiction. *Id.* at 432-33. The court held that the classification in this case made by the legislature bore no relationship to the subject matter of the act, comparing it to legislation that exempted all veterans, as a class, from all taxation or punishment for crime. *Id.* at 433.

¶ 68    The supreme court in *Marallis* found that there was no rational relationship between military service and legislation that permitted veterans to peddle goods without a license and be exempt from licensing fees. The legislation essentially permitted all veterans to peddle goods without consideration of their qualifications, the "sound or debilitated condition of body," or any other factor. *Id.* at 432.

¶ 69    In contrast to the legislation in *Marallis*, the Act and the Department's implementation of the scoring criteria in the Act did not favor veterans without consideration of their qualifications.

In order for the circumstances in *Marallis* to be analogous to those in the case at bar, the Department would have to award Licenses to majority-owned veteran applicants without regard for the other criteria in section 15-30. In this case, all of the veteran-owned businesses that participated in the Tied Applicant Lottery and were awarded Licenses established their qualifications by submitting suitable employee training plans (410 ILCS 705/15-30(c)(1) (West 2022), security and record keeping plans (*id.* § 15-30(c)(2)), business plans, financials, and floor plans (*id.* § 15-30(c)(3)). Each applicant also had to present sufficient evidence of its knowledge and experience (*id.* § 15-30(c)(4)), along with labor and employment practices (*id.* § 15-30(c)(6)), environmental plans (*id.* § 15-30(c)(7)), and diversity plans (*id.* § 15-30(c)(10)). In addition, all of those applicants also earned the 50 points awarded to social equity applicants. The modest boon of five points for their status as veterans did not absolve them of the other requirements of the Act that all other applicants were required to satisfy in order to obtain a License. This is not a situation like *Marallis*, where a veteran could simply present their certificate of honorable discharge and obtain a License. In this case, the General Assembly had a reasonable interest in attracting veteran-owned businesses to the cannabis industry and awarding them five points on their application was a reasonable means of achieving that goal.

¶ 70 We further reject Haaayy's contention that the Department violated its constitutional rights by determining that only applicants with a 252-point application could participate in the Tied Applicant Lottery. When the General Assembly amended the Act through the passage of Public Act 102-98, it adopted its own definition of "Tied Applicant" that differed in one key respect from the Department's original definition of "Tied Applicant." The Department's original definition provided:

> " 'Tied applicant' means an applicant that has received the same number of application points as one or more other applicants in the same BLS region and would have been awarded a license but for the one or more other applicants that received the same number of application points." 43 Ill. Reg. 14934, 14938 (emergency rule eff. Dec. 9, 2019).

The General Assembly's definition provided:

> " 'Tied Applicant' means an application submitted by a Dispensary Applicant pursuant to Section 15-30 that received the same number of application points under Section 15-30 as the Dispensary Applicant's final score as one or more *top-scoring* applications in the same BLS Region and would have been awarded a license but for the one or more other top-scoring applications that received the same number of application points." (Emphasis added.) 410 ILCS 705/1-10 (West 2022).

Haaayy asserts that the General Assembly's addition of the "top-scoring" language in its definition of Tied Applicant implies that the General Assembly intended for applicants with scores other than 252 points to participate in the Tied Applicant Lottery. Haaayy maintains that by receiving 245 points on its application, it received 98% of the available application points, which should be considered a "top-scoring" application. Haaayy points out that, in the amendment, the General Assembly also established the Qualifying Applicant Lottery and the Social Equity Justice Involved Lottery, and the General Assembly determined that an applicant could qualify for those lotteries if it scored at least 213 points. Haaayy maintains that the General Assembly adopted these conditions so that the five points awarded to veteran-owned applicants would not be determinative of whether an applicant could be awarded a License.

¶ 71 Haaayy's contention that the Department should have considered any other score than 252 points a "top-scoring" application is untenable. Haaayy ignores the fact that for an allotment of 47 licenses in BLS Region 5, the Department received 901 applications that received a score of 252 points. Although "top-scoring" is not defined in the Act, we may look to a dictionary to give terms their plain and ordinary meaning. *Watson v. Legacy Healthcare Financial Services, LLC*, 2021 IL App (1st) 210279, ¶ 36. This court has routinely relied on definitions from Dictionary.com in interpreting statutes. *Thornley v. Board of Trustees of the River Forest Police Pension Fund*, 2022 IL App (1st) 210835, ¶ 18. Dictionary.com defines "topscore" as "the highest scorer in a sports match or competition." Dictionary.com, https://www.dictionary.com/browse/topscore (last visited Sept. 19, 2024) [https://perma.cc/M3MD-FTBH]. The Oxford English Dictionary, which our supreme court has relied on in defining the plain and ordinary meaning of undefined terms (see *West Bend Mutual Insurance Co. v. Krishna Schaumburg Tan, Inc.*, 2021 IL 125978, ¶ 40), defines "top-scoring" as achieving "a higher score than other participants in a sporting event, or (more generally) another event in which scores or grades are awarded." Oxford English Dictionary Online, https://www.oed.com/search/dictionary/?scope=Entries&q=top-scoring (last visited Sept. 19, 2024) [https://perma.cc/W2NL-KLNY]. Thus, the "top-scoring" applicants are the ones that scored the "highest" number of points through the application process or that achieved a higher score than the other applicants. The applicants that scored 252 points were the highest scorers and achieved a higher score on their application than Haaayy.

¶ 72 Moreover, the definition of "top-scoring" can be inferred from how the phrase is used in the Act's definition of "Tied Applicant":

"an application submitted by a Dispensary Applicant pursuant to Section 15-30 that received the same number of application points under Section 15-30 as the Dispensary

Applicant's final score as one or more top-scoring applications in the same BLS Region *and would have been awarded a license but for the one or more other top-scoring applications that received the same number of application points*." (Emphasis added.) 410 ILCS 705/1-10 (West 2022).

Thus, a Tied Applicant is an applicant that received a score that would have resulted in the applicant receiving a License, but for the fact that another applicant received the same number of application points. The very fact that the application process has a point system at all indicates that the General Assembly intended for applicants that received the most points should be the first to receive Licenses. If there were only one license available for two applicants, and one applicant scored 240 points and the other scored 210 points, the applicant that scored 240 points would be awarded the License.

¶ 73    In the context of a Tied Applicant scenario, if there were one license available for three applicants, and two of the applicants scored 250 points while the third scored 230 points, there can be no question that the two applicants that scored 250 points are the "top-scoring" applicants, while the applicant that scored 230 points is not. That is because the applicants that scored 250 points "would have been awarded a license but for the one or more other top-scoring applications that received the same number of application points." *Id.* If there were two Licenses available in the scenario described above, the two applicants that scored 250 points would each receive a license, while the applicant that scored 230 points would not. Increasing the number of applicants and the variables of scores as occurred in the actual application process does not alter the result. Each of the 901 applicants that scored 252 points would have been awarded 1 of the 47 available Licenses available in BLS Region 5 but for the fact that those applicants received the same number of application points as one or more other "top-scoring" applicants. If there were 901 Licenses

available, each of the 901 "top-scoring" applicants would have received a License. An applicant such as Haaayy, which scored less than 252 points, would not. Haaayy was thus not a "top-scoring" applicant for purposes of the Tied Applicant Lottery.

¶ 74    In fact, the General Assembly's amendment to the Act actually undermines Haaayy's contentions rather than supports them. As discussed, in amending the Act, the General Assembly established two additional License lotteries: the Qualifying Applicant Lottery and the Social Equity Justice Involved Lottery. The General Assembly determined that to participate in these two additional lotteries, an applicant was required to receive at least 85% (213) of the 250 available application points. *Id.* §§ 1-10, 15-35(a), 15-35.10. The General Assembly therefore specifically provided that for these two lotteries, applicants with scores less than 252 points could participate. Notably, it did not make the same distinction in determining which applicants could participate in the Tied Applicant Lottery, limiting that lottery to the "top-scoring" applications.

¶ 75    We also reject Haaayy's contentions that the Department "deceptively" and "arbitrarily" scored the applications. Haaayy contends that the veteran status exhibit was listed as "optional" on the application, but the Department made the exhibit mandatory by finding that only veteran-owned applicants, which were the only applicants that could achieve 252 points, could participate in the Tied Applicant Lottery. This assertion attempts to obfuscate the way the word "optional" was used on the application. In this case, "optional" meant that an application would not be disqualified if an applicant did not submit an exhibit under this section. However, all applicants, including Haaayy, were on notice that each application exhibit would be assigned a point value and that submitting a valid exhibit for the veteran status section would entitle an applicant to five points. The fact that Haaayy was not awarded these points, and therefore failed to reach 250 (or

252) points, is simply a product of the fact that Haaayy is not majority veteran-owned, not a result of deceptive or arbitrary scoring practices by the Department.

¶ 76     We therefore find that there is a reasonable relationship between the five application points awarded to veteran-owned applicants and the purposes of the Act and that the Department did not act arbitrarily in scoring the applications and determining which applicants would participate in the Tied Applicant Lottery. Accordingly, we find that the Department did not violate Haaayy's substantive due process rights.

¶ 77                                    D. Corrective Lotteries

¶ 78     Haaayy next contends that the Department's proposed limited remand to conduct corrective lotteries violates its rights to equal protection and due process. Haaayy maintains that the Department's "blank entry" method will not give Haaayy the same odds it would have received if it had not been excluded from the original Tied Applicant Lottery. Haaayy asserts that the only proper remedy is either to redo the original lottery or to hold a corrective lottery without blank entries. The Department responds that Haaayy lacks standing to challenge the circuit court's remand order because it opted out of the corrective lotteries.

¶ 79     We find that, based on our findings above, we need not address either parties' contention. As the circuit court recognized in its order entering the limited remand, in order to obtain a License, an applicant must both (1) qualify for the lottery by receiving a sufficiently high score for placement in a particular lottery and (2) win the lottery. The court determined that by granting the Department's motion for a limited remand, it was simply changing the order of those steps, not the criteria. Through this framework, a plaintiff in the consolidated litigation could first determine if it obtained a winning position in the lottery before the circuit court addressed the merits of its

claims. If the plaintiff did not obtain a winning position, there would be no reason for the circuit court to address the plaintiff's claims because the plaintiff would not receive a License.

¶ 80    Haaayy elected to opt out of this procedure, as was explicitly permitted by the circuit court's order. Haaayy thus chose to be subject to the standard licensing procedure; it would first have to prove that it qualified for a lottery (*i.e.*, succeed on the merits of its claims that it was improperly excluded from the Tied Applicant Lottery), and then it would have to obtain a winning position in a corrective lottery. Therefore, Haaayy would have standing to challenge the corrective lottery procedure only if it succeeded on the merits of its claims and was eligible to participate in the corrective lottery. Because we find that the Department did not unconstitutionally exclude Haaayy from the Tied Applicant Lottery, Haaayy will not participate in the corrective lottery. It therefore has no real interest in constitutionality of the corrective lottery procedure and may not challenge the process on behalf of third parties who participated or may participate in the corrective lottery. *In re Estate of Lay*, 2018 IL App (3d) 170378, ¶ 13. Accordingly, we find that Haaayy lacks standing to challenge the circuit court's limited remand order for corrective lotteries.

¶ 81                                    III. CONCLUSION

¶ 82    For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 83    Affirmed.

---

*Haaayy, LLC v. Illinois Department of Financial & Professional Regulation*,
**2024 IL App (1st) 221833**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 21-CH-5980; the Hon. Celia Gamrath, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Robert M. Walker, of The Walker Law Group, LLC, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Richard S. Huszagh, Assistant Attorney General, of counsel), for appellee. |